287 So.2d 847

**STERLING OIL OF OKLAHOMA, INC., et al.**

v.

**Howard M. PACK et al.**

**Bart B. CHAMBERLAIN, Jr., et al.**

v.

**STERLING OIL OF OKLAHOMA, INC., et al.**

**SC 69, 69X, 69X–1, 69X–2, 69X–3, 69X–4.**

Supreme Court of Alabama.

Nov. 15, 1973.

Rehearing Denied Jan. 24, 1974.

**730**

Willis C. Darby, Jr., Mobile, for appellant and cross-appellee, Sterling Oil of Oklahoma, Inc., and for appellants, Herbert C. Smyth and W. H. James, Jr.

Harold D. Parkman and W. Dewitt Reams, Mobile, for appellee and cross-appellant Bart B. Chamberlain, Jr.

C. A. L. Johnstone, Jr., Mobile, for appellees Big Four Oil Co., Inc., James E. Kemp and Four States Drilling Co., Inc. and cross-appellant, Big Four Oil Co., Inc.

Sam W. Pipes, III, Mobile, for appellees and cross-appellants, Howard M. Pack and Joseph Kahn.

Champ Lyons, Jr., Montgomery, for appellees and cross-appellants, The Equity Corp., Richard E. Peck, as trustee for The Equity Corp. and Cornwall Trading Corp.

Joseph M. Matranga, Mobile, for appellee and cross-appellant, George H. Jett.

PER CURIAM.

Ten years of litigation culminate in this appeal. This total litigation between the parties consists of three separate law suits arising out of the purchase as of May 1, 1959, of Gulf Oil Company's and Gulf Refining Company's interests in the Citronelle oil field and gathering system in Mobile County, Alabama. Each of these three actions has a long, intertwined, and convoluted history.

## FACTUAL BACKGROUND

In 1956, Bart B. Chamberlain, Jr. and some associates formed a corporation to acquire oil and gas leases from the State of Alabama on submerged lands off the Alabama coast. The corporation so formed was Tidelands Development Corporation and from the start it was the intention of its creators to sell the corporation to Sterling Oil Company of Oklahoma. Early in 1957, Chamberlain met in Miami, Florida, with Jesse A. True, the President of Sterling, and it was agreed that Sterling would buy Tidelands for 250,000 shares of Sterling stock, $5,000 in cash, and the payment of the initial rental fee to the State of Alabama, being $121,500.

As a result of the above transaction, Chamberlain acquired 200,000 shares of Sterling stock, began to take an active interest in Sterling's business activities, and to represent Sterling as one of its attorneys.

During this same period of time (early 1957), there was pending in the U. S. District Court for the Southern District of New York anti-trust litigation against Gulf Oil Corporation and several other oil companies. The plaintiff was Gerald B. Waldron who alleged anti-trust violations on the part of the defendants arising out of a Middle East oil transaction. True of Sterling had received information, and he in turn informed Chamberlain, that Gulf and Waldron were each separately interested in settling the litigation by creating or finding a "normal" business transaction through which Gulf could buy or sell properties, with Waldron indirectly benefiting therefrom. This benefit would induce Waldron to dismiss Gulf as a party defendant in the anti-trust suit.

True solicited Chamberlain's assistance in arranging for Sterling to be the third party to the business deal sought by Gulf and Waldron. Chamberlain agreed and, during the spring and summer of 1957, Chamberlain and True presented several possible transactions involving foreign properties, each of which was rejected by Gulf. Then Chamberlain hit on the idea of purchasing the Gulf properties in the Citronelle oil field in Mobile County, Alabama, as the transaction to accomplish the settlement. The interests owned by Gulf in Citronelle consisted of producing leases and non-producing leases. Gulf Refining Company, a wholly owned subsidiary, owned an oil pipeline and gathering system which served the Citronelle field. As originally contemplated, the transaction with Gulf was to be a 50/50 proposition with Chamberlain in charge of the negotiations and Sterling to handle the financing and to provide the operational expertise required to manage and operate the Citronelle properties to be purchased from Gulf.

The negotiations went on for several months before Gulf determined that it would not deal with Sterling. It was Gulf's intention to retain an overriding royalty interest in the producing leases as part of the consideration for the sale. After a careful study of Sterling's financial condition and technical operating experience and ability, Gulf determined that there would be no deal if Sterling was to be the operating company.

Still anxious to deal with Chamberlain, Gulf suggested George H. Jett's company as a substitute for Sterling as the operating company and Chamberlain was able to interest Jett in the transaction. Jett was brought into the deal with Chamberlain and Sterling under a written agreement dated April 16, 1958. Because this agreement gave Sterling a certain amount of operational control over the properties, Gulf still refused to come to terms. To remove this objection, it was decided that Sterling's interests would thereafter be held in trust and Sterling would not have any direct control over the operation of the Citronelle properties after they were acquired from Gulf.

With Gulf's concern over Sterling's participation resolved, Chamberlain continued intense, but intermittent, negotiations during the remainder of 1958. Gulf was considering the sale of its Citronelle interests very carefully and as a means of fixing its

value was awaiting the results of an engineering study which was being done at Citronelle by Core Laboratories. Finally, in February, 1959, Chamberlain and Jett met with representatives of Gulf in Houston, Texas, and the terms of an agreement were settled by which Gulf would sell its Citronelle holdings.

As the first step to complete the deal, Sterling assigned to Chamberlain and Jett an agreement Sterling had obtained from Waldron in March, 1958. The "Waldron Agreement" provided that on the date Sterling acquired the producing properties of Gulf at Citronelle, Waldron would dismiss Gulf as a defendant in the anti-trust suit and Sterling would pay to Waldron $150,000 and a like amount each successive year for nine years. Although this agreement was assigned to Chamberlain and Jett, Sterling was not released from its obligations under the agreement. Additionally, Sterling was instrumental in obtaining month to month extensions of the Waldron Agreement pending negotiations with Gulf.

The next step was to arrange for the financing of the acquisition. Sterling's promises of providing the financing did not materialize and Chamberlain and Jett were forced to obtain the necessary funds themselves. The basic financing was ultimately arranged with the Chase Manhattan Bank through the assistance of Howard M. Pack and Joseph Kahn, friends of Chamberlain. The bank agreed to lend only $4,000,000 on a production payment without recourse, $500,000 on the production mortgage, and $1,250,000 on a pipeline mortgage with recourse to Jett and Chamberlain. Since the total cash price to Gulf was $6,750,000 (the balance of the full purchase price was to be paid on a production basis), this left Jett and Chamberlain short by $1,000,000 in equity money and $500,000 in necessary working capital.

While Chamberlain and Jett were in the process of trying to obtain the additional financing, a dispute arose as to the extent and character of Sterling's interest in the deal as it then stood. Chamberlain had a trust agreement drawn up which provided that Sterling would have a ⅓ interest held in trust with Chamberlain as the trustee. True objected to Chamberlain as Sterling's trustee and a meeting was set up at the St. Regis Hotel in New York on April 8, 1959. At this meeting were Chamberlain, Jett, True, Albert B. Zink, a director and attorney for Sterling, and Raymond A. Corcoran, a lawyer representing Gulf, who insisted that Gulf's offer to sell would not be extended beyond the contract deadline of May 1, 1959.

During the meeting, heated words were exchanged between True and Chamberlain. True wanted Sterling to take title to its interest in its own name and Chamberlain insisted that because of Gulf's objection, that was impossible. True refused to allow Chamberlain to act as Sterling's trustee and threatened to sue Gulf to which Corcoran replied, "Go ahead." Zink then said something to the effect that perhaps the Chase Bank will have a different attitude about a law suit. At this point, Chamberlain ordered True and Zink out of his room and they left. Zink returned later that same evening and told Chamberlain that something could be worked out rather than "blow the deal".

The next day there was a meeting at the office of Waldron's attorney between Chamberlain, Jett, Zink, and Corcoran. At this meeting an agreement was reached whereby Sterling, through Zink as trustee, would get an interest in the deal, and True would not go to the bank and destroy the financial arrangements. On this same day, Zink got Jett to sell him a 2½% interest in the transaction for which Zink later paid Jett $2,000. This little side deal was concluded without Sterling's knowledge or consent.

With the Sterling problem temporarily resolved, Jett and Chamberlain renewed their efforts to obtain the additional financing. Again, with the help of Pack and Kahn, the sum of $1,500,000 was borrowed from The Equity Corporation, se-

cured by a limited guarantee of Pack and Kahn and a second mortgage on all the assets being purchased from Gulf. Also, as part of this financing arrangement, Jett and Chamberlain were required to convey a 5% interest to Pack and Kahn and a 20% interest to The Equity Corporation in the producing and nonproducing leases, and a 5¾% interest to Pack and Kahn, and a 23% interest to The Equity Corporation in the gathering system. The Equity Corporation took title to its interest in the name of a wholly owned subsidiary, Cornwall Trading Corporation. By a supplemental agreement between Jett, Chamberlain, Pack, Kahn, and Cornwall, it was agreed that when payments became due to Sterling, the interests of Pack, Kahn, and Cornwall would be subject thereto but at the same time proportionately increased so that their net take would remain the same.

The acquisition from Gulf was concluded on May 1, 1959. The agreement reached between Chamberlain, Jett, and Sterling bears that same date although it was not completely executed and delivered in its final form until August 18, 1959. Sterling qualified to do business as a foreign corporation in Alabama on August 6, 1959.

This contract (The Sterling Agreement), the basis of this litigation, is a long and complex document. By its terms the parties annulled, cancelled, and terminated all agreements of every sort and kind pre-viously made and entered into between them; Sterling transferred to Jett and Chamberlain all of its rights, interests, claims, and demands of every kind, character and description in return for which Jett and Chamberlain agreed to grant and convey to Zink, as individual trustee for Sterling, certain interests in the Citronelle properties upon the occurence of four events:

(a) When the production payment carved out and reserved by Gulf shall have been fully paid and satisfied;

(b) When the production loan shall have been fully paid and satisfied;

(c) When $500,000 of the amount borrowed from The Equity Corporation, which had been applied to the purchase of producing leases from Gulf, shall have been repaid; and

(d) When Jett and Chamberlain shall have recovered all legal fees, printing costs, and other expenses incurred by them in connection with the financing referred to above.

When these four events had occurred, Zink, as trustee for Sterling, would receive:

(1) An overriding royalty in each producing lease equal in value to 25% of a working interest in the leases (§ 6) ;[1]

---

I. This paraphrase of Sterling's interest in the producing leases has been overly simplified to facilitate a manageable recitation of the facts; but due to a contention of invalidity of this provision on grounds of vagueness and uncertainty—and our later treatment of this issue—we set forth in haec verba the pertinent language of this section of the contract:

"6. . . . Jett and Chamberlain will transfer and assign to the individual trustee for Sterling an overriding royalty interest in each lease then in effect which was a Producing Lease or a Producing Property within the definitions contained in this Agreement, the percentage of such overriding royalty to be computed as hereinafter provided, separately as to each such Producing Lease, so that the overriding royalty shall be equal in value, as of the date of said transfer and assignment, to the value on that date of a 25 per cent working interest in each of such Producing Leases acquired from Gulf Oil by Jett and Chamberlain at Closing.

"The parties hereto agree that promptly when all of the conditions set forth in subdivisions '(a)', '(b)', '(c)' and '(d)' above shall have been fully complied with, or prior thereto, each of them will nominate in writing a petroleum engineer or engineering firm, which is to say, Jett and Chamberlain, acting together, will nominate one petroleum engineer or engineering firm, and the individual trustee for Sterling will nominate another engineer or engineering firm, each engineer to be authorized, directed and paid by the one who

(2) Certain percentages of the gross profits of the gathering system (§ 7);

(3) An overriding royalty of 1⁄64 of 7⁄8 on each non-producing lease (§ 8); and

(4) Certain participation rights in the "deep tests" if and when such were ever conducted (§ 9).

Jett and Chamberlain took over the operation of the Citronelle properties as of May 1, 1959. During that first summer production declined sharply, the bank commitments went into default, and the possibility of foreclosure was an ever present threat. It became necessary to invest large sums of money in reworking the wells and effecting a secondary recovery. Sterling did not contribute to this work-over program in any way. Following the extensive work-over program, production increased substantially and the venture ultimately became a financial success.

By the year 1963, most of the bank commitments and all of Gulf's production payment had been fully paid and satisfied. However, Sterling had yet to receive a cash payment representing its interests in the properties. Another dispute arose between Sterling and Chamberlain over the amount due Sterling and this conflict resulted in the litigation now before us.

## THE BATTLE OVER THE FORUM

The parties in the first suit, filed March 6, 1963, were Jett and Chamberlain as plaintiffs and Sterling and its individual trustees (Zink and Herbert C. Smyth) as defendants (Jett-Chamberlain action). Diversity necessary for removal to federal court existed on the face of the pleadings. After removal by Sterling, and while motions for leave to join Pack, Kahn, and others as indispensable parties were under submission before the federal court, the second suit was filed July 3, 1963, by Pack, Kahn, and George H. Jett Drilling Company as plaintiffs against all other parties in interest, primarily Jett, Chamberlain and Sterling Oil (Pack-Kahn action), seeking essentially the same relief as sought by the plaintiffs in the Jett-Chamberlain action. Although apparently absent of complete diversity, Sterling Oil removed the Pack-Kahn action alleging fraudulent joinder of parties. In anticipation of the granting of the motion to add parties plaintiff in the Jett-Chamberlain action and on the ground of lack of diversity in the Pack-Kahn action, Jett and Chamberlain filed respective motions to remand as to each of the first

---

nominated him, to make such studies, examinations and evaluations necessary to equate the percentage of working interest set forth above to the overriding royalty interest hereinabove in this paragraph provided for.

"The petroleum engineer or engineering firm to selected shall be authorized by the person nominating him to agree on behalf of the person nominating him on that percentage of overriding royalty interest which would be equal in value to the percentage of working interest, as contemplated by this Agreement; further authorizing such engineer to agree, in the event that the two engineers or firms cannot agree on such an evaluation, on the appointment of a third engineer, and that thereafter the majority of the three engineers or engineering firms thus appointed shall have the right to fix such percentage of overriding royalty interest, the parties to be bound thereby.

"Jett and Chamberlain agree that in the event they shall voluntarily amend the terms of the Production Loan so as to delay or extend the time for final payment thereof beyond the time when the same would have been fully paid if not changed from the form and content in which it existed at the date of Closing with Gulf Oil, unless such change or amendments become necessary for reasons beyond their control, or because the Producing Leases did not produce sufficient income to the operators to operate said leases, then in such event, when the engineers fix the amount of the overriding royalty, as hereinabove provided for, to be assigned to the trustee for Sterling, it shall be done so as to pay Sterling as if it had been made effective retroactive to the date when, but for such delays in the payment of such Production Loan, the application of such overriding royalty would have become effective."

two suits. The third suit was filed by Sterling in federal court on November 22, 1963, seeking specific performance of the contract favorable to Sterling, and for an accounting.

On January 6, 1964, the federal district court denied the petitions to intervene and the motions to remand, which rulings were appealed by Jett, Chamberlain, Pack, Kahn, and Cornwall (Chamberlain's group). For the reasons set forth in its consolidated opinion, despite a "disclaimer" filed by Sterling as to any right of action against Pack, Kahn, and Cornwall, the U. S. Fifth Circuit Court of Appeals affirmed as to the Jett-Chamberlain action (holding that none of the non-party petitioners was an indispensable party), and reversed as to the Pack-Kahn action (holding that there was no clear and persuasive evidence of fraud inherent in the bringing of that action while motions to intervene in the Jett-Chamberlain action were still pending). This left the first suit (Jett-Chamberlain action) in the federal forum and remanded the second suit (Pack-Kahn action) to the state forum. The Fifth Circuit Court's opinion, reported in 362 F.2d 723 at 730, concluded (first Jett v. Zink appeal, 1966):

"The result is unfortunate in that it leaves the same issues pending simultaneously in a state and federal court but we see no escape from our conclusion. The parties here brought it upon themselves in their battle over the forum in which to try their case."

On November 3, 1966, the federal district court in the Jett-Chamberlain action granted Sterling's Motion for Summary Judgment and found the Sterling Agreement to be a "valid, enforceable and subsisting agreement", which order was supplemented on November 15, 1966, making clear that its November 3 partial summary judgment was limited in its scope to disposition of the issue of Sterling's qualifying to do business. The November 15 order continued:

" . . . [I]n using such language [as to the validity of the agreement] the court had no intention of determining the meaning or enforceability of any of the specific provisions of the Sterling Agreement which are the subject of controversy between the parties to this cause." [2]

Further, on March 11, 1971, the federal district court denied Sterling's motion, based on the partial summary judgment, to strike amendments by Jett and Chamberlain to their earlier complaint and answer to Sterling's cross claim, which amendments questioned the validity of the Sterling Agreement on additional grounds of fraud, misrepresentation, duress, and business compulsion.

In the second Jett v. Zink appeal, 474 F. 2d 149 (Fifth Circuit, 1973), the court in chronologizing the events between the first and second appeals aptly observed:

"As all parties now concede, our decision [the 1966 appeal] signaled the start of a race to the courthouse. Despite our signal, which was supposed to remove the brakes from the wheels of justice, it took an additional five years for either of the cases to get in gear. The interim saw a great deal in the way of sparks— extensive discovery, another unsuccessful removal, and interminable procedural squabbling—but little motion down the road to a decision. Finally, in February 1971, the district court, on its own motion, began pre-trial proceedings that were intended to lead to a federal trial beginning July 12, 1971. In response to this federal warm-up, Chamberlain's group [all parties in interest except Sterling] filed in the state court a motion to have the Pack-Kahn action set for trial before the Jett-Chamberlain action; it

---

2. It is significant to note (for purposes of our later consideration of res judicata) that, at the time of such order, the only ground of contest of validity was the very issue adjudicated, i. e., Sterling's qualifying to do business.

ultimately was set for trial May 4, 1971. Sterling Oil in turn reacted to this development on April 15, 1971, by asking the district court for a preliminary and permanent injunction against the state court proceedings. On April 20, 1971, the district court heard argument on the motion for preliminary injunction and on April 28, 1971, denied relief. Sterling Oil appealed this denial, but was unsuccessful in obtaining an injunction pending appeal from either the district court or this court.[5] Subsequently this appeal was dismissed for lack of prosecution.

"With the final impediment removed, the state court began six weeks of hearings in the first phase of its trial—determining the validity *vel non* of the Sterling Agreement—and on July 10, 1971, that court entered an interlocutory decree finding it valid. Having made extensive, although at that point unsatisfactory, progress in the resolution of several substantial questions and having invested considerable time, Chamberlain's group on July 12, 1971, the day the federal trial was to begin, filed a motion in the district court to stay the federal proceedings pending a final determination in the state court. After hearings on July 12 and 14, the district court granted that motion. Additionally, at the hearing on July 14, Sterling Oil's petition for permanent injunction filed on April 15, 1971, was submitted to the court without further argument; this petition was denied July 16, 1971. Sterling Oil's appeal from this denial is before us . . .[6]

"Free of the complications that a simultaneous federal trial would have caused, the state court reconvened on August 2, 1971, for phase two of its trial. After weeks of hearings, that court issued its final decree November 4, 1971. Withdrawing its interlocutory decree of July 10, it found the Sterling Agreement to be unenforceable, but subsequently held that Sterling Oil was entitled to a finders fee and reasonable compensation for services totaling in excess of $500,000. This decree was incorporated into the pleadings of the Jett-Chamberlain action and on January 27, 1972, the district court granted the Chamberlain group's motion for summary judgment based on the res judicata effect of the state court decree. Sterling Oil's appeal from the summary judgment is before us . . . .[7]

"5. Sterling Oil also applied for prohibitory relief in the Alabama Supreme Court. After a hearing on April 30, 1971, that application was denied on May 3, 1971.

"6. Sterling Oil later amended its Notice of Appeal to include the district court's order of July 14, 1971, which granted a stay of the federal proceedings.

"7. The federal action filed by Sterling Oil had been consolidated with the Jett-Chamberlain action for trial and was included within the scope of the district court's order granting summary judgment." [Brackets supplied.]

In upholding the district court—denying injunctive relief against the state court suit (Pack-Kahn action) and giving res judicata effect to the state court decree—the Fifth Circuit Court's opinion quoted from its earlier holding in 362 F.2d at 729–730:

"'[T]here was good reason for bringing the second suit [Pack-Kahn action] in order to assure the plaintiffs therein [Pack, Kahn, and Geo. H. Jett Drilling Company] a day in court in the event that they were not admitted as parties plaintiff in the earlier suit, as indeed they were not. The question is whether they have stated a cause of action against any of the defendants whose presence in the litigation would destroy complete diversity of citizenship of the parties. We think they have.'"

The opinion thus concluded:

"The now apparent fact that Chamberlain controlled both pieces of litigation is cause for serious concern, but it does not consititute 'clear and persuasive evidence' of fraud. Chamberlain had been given authority to act for Pack, Kahn, and Jett and he was justified in bringing

a suit in their names to protect their interests.

"   .   .   .

"Sterling Oil has advanced only one argument as to why, with the Jett-Chamberlain action stayed and the Pack-Kahn action free to proceed, a final judgment in the latter should not be res judicata in the former. It contends that the district court considered the July 10, 1971, order of the state court res judicata and that the parties agreed on July 14, 1971, to raise no 'new issues' in the state court if that action were allowed to continue. This statement, while correct, does not aid Sterling Oil. The July 10 [1971] state court order was virtually identical to the November 15, 1966, partial summary judgment in the district court, and dealt with Sterling Oil's having qualified to do business. While withdrawn by the state court's final judgment, it was not contradicted; instead the Sterling Agreement was invalidated on grounds which had already been incorporated in the federal pleadings prior to July 14, 1971 and which were therefore not 'new' in terms of the parties' agreement. Because it was conceded that the Pack-Kahn action raised issues which were identical to those raised in the Jett-Chamberlain action, we hold that the district court correctly granted summary judgment in the Jett-Chamberlain action based on the final state judgment in the Pack-Kahn action."

This leaves the instant appeal (Pack-Kahn action) as the only litigation remaining between the parties.

## THE INSTANT APPEAL (PACK–KAHN ACTION)

This cause is before the Court on the appeal of Sterling and certain named trustees, and the cross appeal of the Chamberlain group, from a final decree of the Circuit Court of Mobile County, Alabama, in equity sitting, entered November 29, 1971.

The original bill of complaint for declaratory judgment filed by Pack, Kahn and George H. Jett Drilling Company, Inc., sought to have the Sterling Agreement held invalid and unenforceable on the ground that Sterling was not qualified to do business in Alabama at the time the contract was made, and praying in the alternative that, if valid, the court would interpret the provisions of the agreement favorable to the complainants.

The next four years were consumed by an intense battle between the parties over the forum dispute as heretofore outlined.

On June 8, 1967, Chamberlain filed his answer and cross bill, in general admitting and adopting the allegations of the original bill. However, Chamberlain asserted for the first time, as further grounds for the invalidity and unenforceability of the Sterling Agreement, the allegations that the agreement was obtained by reason of fraud, misrepresentation, duress, and business compulsion practiced upon Jett and Chamberlain by Sterling, its officers and attorneys. Additionally, Chamberlain alleged that the operative provisions of the Sterling Agreement are so vague and indefinite as to make the document incapable of specific performance.

On May 3, 1968, Sterling filed its plea in abatement (later amended) alleging the prior pendency of the Jett-Chamberlain action, the Sterling counterclaim therein, and the pendency of the Sterling action. On March 8, 1971, the circuit court ordered the case set for trial on May 4, 1971. In the meantime, the trial court sustained demurrers to Sterling's pleas in abatement, which ruling is assigned as error.

On May 3, 1971, the court entered its pretrial order, which provided, inter alia:

"[T]hat the trial of the case shall proceed first to a determination to the issues of the validity of the 'Sterling Agreement', secondly, to a consideration of the issues relating to the construction of the 'Sterling Agreement', and thirdly,

to the issues relating to the accounting only if and after the Court has concluded that the 'Sterling Agreement' is valid and after the issues relating to construction have been determined by the Court."

On June 18, 1971, Jett amended his answer to add a cross-claim against Zink, Smyth and Sterling. Jett's cross-claim in part averred:

"The respondent G. H. Jett further avers that ALBERT BARNES ZINK did exert further economic duress and further intimidated G. H. Jett by stating to him in a Taxi cab at about the same day that he could stop the said Jesse True from going to the Chase Bank with his threats of law suits if Jett would give him part of his interest, which Jett subsequently did and for which there was no agreed price . . . that subsequently in 1963 Jett paid to Albert Barnes Zink approximately $142,000.00 for a quit claim deed which released any claim which Zink may have had in the Citronelle Oil Fields. . . . that sometime around 1967 Sterling Oil received from Zink approximately $140,000.00 by claiming that Albert Barnes Zink while acting on behalf of Sterling wrongfully obtained this amount from Jett . . . . that Albert Barnes Zink was acting in his representative capacity for Sterling at the time that he extracted his interest in the Citronelle Oil Fields from Jett and that when Sterling Oil found out of Zink's actions they made claim against Zink for the money which Jett paid to Zink and Zink paid Sterling $140,000.00."

On July 10, 1971, after hearing the testimony of Chamberlain, Jett and Corcoran, by interlocutory order, the circuit court found:

"Sterling . . . executed the Sterling Agreement in New York on May 26, 1959; Zink executed the Sterling Agreement in Pennsylvania on May 27, 1959; Sterling . . . qualified to do business in Alabama on August 6, 1959; Chamberlain executed the Sterling Agreement voluntarily on August 17, 1959, in Mobile, Alabama; Jett executed the Sterling Agreement voluntarily in Shreveport, Louisiana on August 18, 1959.

"Although the Sterling Agreement related back to and became effective as of May 1, 1959, it was actually made and delivered after Sterling . . . qualified to do business in the State of Alabama.

"The Sterling Agreement is supported by adequate considerations flowing from Sterling Oil to Jett and Chamberlain.

"It is ORDERED, ADJUDGED AND DECREED that the Sterling Agreement is a valid, enforceable and subsisting agreement between [the parties].

"It is further ordered that the remaining proceedings herein shall proceed on the premises that the Sterling Agreement is a valid, enforceable and subsisting agreement, the court reserving for future determination all controversies between the parties with respect to the meaning and enforceability *vel non* of the specific provisions of the Sterling Agreement."

On August 2, 1971, the appellees filed a motion to set aside the decree of July 10, 1971.

On November 4, 1971, after several weeks of additional testimony, the court entered a final decree ordering that "The interlocutory decree entered on July 10, 1971, is hereby withdrawn, set aside, and cancelled", and finding the Sterling Agreement to be "invalid, unenforceable, and without legal force or effect". No ground or grounds upon which the trial court based its finding of invalidity are set forth, but the court further found " . . . that even though Sterling had unclean hands as a result of its improper actions both prior to the making of the Sterling Agreement and after the making of said agreement, that nonetheless Sterling did make contributions to the overall project . . .

[and] that Sterling is entitled to a finder's fee in a reasonable amount for having introduced Waldron to Chamberlain". The court also found that "Zink wrongfully extracted a 2½% interest in the Gulf-Jett-Chamberlain transaction from Jett for a nominal consideration of $2,000.00, and that he sold this interest for $141,921.73 on April 8, 1964 . . . [and] that Zink's wrongful actions were ratified by Sterling when it required Zink to pay to it $140,000.00 of the amount received by Zink in the sale of said 2½% interest, and that Jett is entitled to recover from Sterling the $140,000.00 which was paid to Sterling by Zink, plus interest thereon from June 27, 1967. . . ."

On November 29, 1971, the court entered · a further final decree, awarding Sterling a finder's fee of $35,000.00 and awarding Sterling an additional sum of $250,000.00 as "reasonable compensation due Sterling . . . for all of its services in the matter in respect to which this litigation arose other than services rendered Chamberlain as a finder," with interest thereon totaling $500,175.00 apportioned to their respective interests among the Chamberlain group, who cross appeal asserting the money judgment in favor of Sterling as error.

## CONTENTIONS OF THE PARTIES
### On The Appeal

Appellees (Chamberlain group), in support of the trial court's final decree (except for the money judgment in favor of Sterling), contend that the Sterling Agreement is invalid and unenforceable because:

1. The agreement was made and entered into prior to the time that Sterling qualified as a foreign corporation to do business in the State of Alabama.

2. The agreement was the product of economic duress and business compulsion practiced upon Chamberlain and Jett by Sterling and its representatives.

3. The doctrine of unclean hands bars Sterling from obtaining any relief under the agreement because of its improper actions both prior to and after the making of the agreement.

4. The provisions of the agreement purporting to obligate Jett and Chamberlain to convey interests in the future violate the Rule Against Perpetuities.

5. The operative provisions of the agreement purporting to give interests to Sterling in the properties acquired from Gulf are void for uncertainty and indefiniteness, as the parties failed to reach a meeting of the minds sufficient to reflect an agreement capable of being enforced with judicial certainty.

Appellants (Sterling and its trustees) attack the final decree of the trial court by specific assignments of error, which, when analyzed and classified, may be stated as follows:

1. The pendency of the federal litigation abates the instant cause; or, in the alternative, the federal court's summary judgment is res judicata on the single issue of Sterling's qualifying to do business.

2. The relationship of joint adventurers existed first between Sterling and Chamberlain and then among Sterling, Chamberlain, and Jett, which created in Sterling an interest in the Gulf transaction so as to render inoperative the economic duress doctrine.

3. Assuming the Sterling Agreement was the product of economic duress, ratification of the contract by the Chamberlain group occurred long before the assertion of this defense; and that this contention is equally applicable to the money judgment against the appellants and in favor of the appellee Jett (the 2½% interest transaction).

4. The Rule Against Perpetuities is not violated by the conveying instrument, which by its express language limits the interest granted to a term not to exceed ·twenty-one (21) years.

5. The doctrine of unclean hands has no field of operation as to collateral matters but is confined to the controversy at hand, and is not to be used to defeat justice when the party invoking the doctrine has repealed all possible benefits from the transaction.

### On the Cross Appeal

The Chamberlain group, cross appellants, contend:

1. That the trial court's finding of unclean hands on the part of Sterling renders inconsistent and erroneous the money judgment in favor of Sterling and apportioned according to their respective interests among the Chamberlain group.

2. That aspect of the final decree awarding money damages in favor of Sterling and against Pack, Kahn, and Cornwall, should be reversed and rendered in view of the "disclaimer" of Sterling.

### The Appeal

1. QUALIFICATION TO DO BUSINESS—LEGAL EFFECT OF THE FEDERAL LITIGATION

The first and most obvious effect of the federal litigation, and its resultant judgments, is the elimination of all but the instant case (Pack-Kahn action). Less obvious, perhaps, but no less significant are at least two additional legal results which we believe are depositive of several of the contentions now before us:

█ (1) *The Issue of Abatement.* Appellants contend that the prior pendency in federal court of the Jett-Chamberlain action abates this case. Absent the federal court decrees, we would view this contention quite seriously even in the face of "additional parties" in the Pack-Kahn action. See Foreman v. Smith, 272 Ala. 624, 133 So.2d 497 (1961); and Ex Parte Dunlap, 209 Ala. 453, 96 So. 441 (1923). We think it is clear, however, that the federal litigation has settled this issue adversely to the appellants.

There is no doubt, as we now review the history of the federal litigation, that the federal court treated the parties plaintiff in this action (Pack, Kahn, and Jett Drilling Co.) as additional parties. Although, as we have seen, the first Jett v. Zink appeal disallowed Pack, Kahn, and Cornwall as "indispensable parties" in the Jett-Chamberlain action, it ordered the Pack-Kahn action remanded on the basis that the plaintiffs therein were legally entitled to prosecute their action in state court. Commenting on Sterling's claim of fraudulent joinder, the opinion in the second Jett v. Zink appeal concluded:

"The now apparent fact that Chamberlain controlled both pieces of litigation is cause for serious concern, but it does not constitute 'clear and persuasive evidence' of fraud."

The district court then stayed the federal action to allow the state action to proceed.

Moreover, practical considerations now dictate that we not hindsight the issue of "additional parties"—on which the larger issue of abatement rests—to a contrary result, and thus abate the only remaining litigation between the parties. Fegaro v. South Central Bell, 287 Ala. 407, 252 So.2d 66 (1971). As to abatement generally, see Logan v. O'Barr, 271 Ala. 94, 122 So.2d 376 (1960); see also Alabama Power Co. v. City of Scottsboro, 238 Ala. 230, 190 So. 412 (1939); and Strother v. McCord, 222 Ala. 450, 132 So. 717 (1931).

(2) *The Issue of Res Judicata.* The above holding adverse to the appellants on the issue of abatement does not of itself dispose of appellants' other contention that the trial court was bound to give res judicata effect to the partial summary judgment of the federal court on the issue of Sterling's qualifying to do business. Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922).

The legal test, of course, is the finality *vel non* of such judgment. While it is true that a federal summary judgment is interlocutory to the extent that it may be revoked or amended any time prior to final judgment (Coffman v. Federal Laboratories, Inc., 171 F.2d 94 (3rd Cir., 1948)), it is also true that such judgment, contrary to our state practice, may be an appealable order under the circumstances here pertaining.[3]

We have been cited to no persuasive authority, and we have found none, on either side of this issue. We believe the appealable nature of such order—given the other prerequisites—is the controlling factor; and we, therefore, hold that the principle of comity requires that we give res judicata effect to the judgment of the federal court, applying Alabama substantive law, holding on its merits that the Sterling Agreement is not void for failure of Sterling to qualify as a foreign corporation in Alabama at the time of the execution of the contract, which judgment was neither revoked, amended, nor reversed on appeal. See Watson v. Mobile & O. R. Co., 233 Ala. 690, 173 So. 43 (1937).

The fact that this was a *partial* summary judgment is of no moment since the word "partial" refers only to a limitation of the issues within the purview of such order and not to the quality of the judgment as to the issue so adjudicated. See Biggins v. Oltmer lron Works, 154 F. 2d 214, (7th Cir., 1946). Likewise, the subsequent dismissal of the Jett-Chamberlain action—consolidated with the Sterling action—does not alter this result. Indeed, the Fifth Circuit Court's opinion (the second Jett v. Zink appeal), affirming the district court's dismissal on the principle of res judicata of the state court decree in this cause, grounded its decision, in part, on an agreement of the parties that, in the event the federal district court stayed the trial of the Jett-Chamberlain action, the state court action would proceed on no "new" issues, the only "old" issue being Sterling's qualifying to do business.[4]

Moreover, for this Court to now hold otherwise as to either of the issues of abatement or res judicata would be tantamount to a restructuring by this Court of the status of the controversy at the time of the commencement of this trial, which status had been fashioned and tailored by the parties through the federal litigation; and, at this late hour, we are unwilling to cut the pattern to fit the cloth.[5]

3. Care should be exercised not to construe this statement as holding that every federal summary judgment will be accorded res judicata effect by this Court; the finality for such purpose is wholly dependent upon the criteria for appealability set forth in Title 28, § 1291, U.S.Code, Annotated (Note 146). As to summary judgments generally, see Wright, Federal Practice and Procedure, § 2737.

4. Note the reference made to this agreement of the parties in the last quoted paragraph of Jett v. Zink (second appeal) set out above at the conclusion of our discussion of the "Battle Over the Forum". Although we have grounded our holding as to this issue on the doctrine of res judicata, the principle of estoppel based on the agreement of the parties to proceed on no "new" issues would likewise operate to force the same conclusion. See Davis v. Wakelee, 156 U.S. 680, 15 S.Ct. 555, 39 L.Ed. 578,

15 S.Ct. 555 (1895); Watt v. Lee, 238 Ala. 451, 191 So. 628 (1939).

5. There is nothing in the record to indicate, nor do we have reason to suspect, that the trial court's reversal of its holding as to validity was grounded on the issue of Sterling's qualifying to do business. Indeed, the undisputed facts on their merits dictate a finding consistent with both the federal summary judgment and lower court's interlocutory order holding the agreement valid on this issue as a matter of law. Title 10, § 21(87), Code of Alabama 1940, as amended.

Furthermore, it was Chamberlain who employed legal counsel on behalf of Sterling for the express purpose of qualifying Sterling to do business in Alabama as a foreign corporation, and for the further purpose of handling the execution and delivery of the contract so as not to run afoul of this legal impediment.

## 2. ECONOMIC DURESS AND RATIFICATION

While economic duress is a relatively new legal doctrine, and this Court apparently has not heretofore expressly applied the doctrine in the context of business compulsion, the basic concepts of duress and undue influence—the ancestor of its modern progeny—have long been recognized by our cases.[6] In view of the conclusion we hereafter reach with respect to ratification, we pretermit an extended discussion of the doctrine of economic duress and business compulsion.[7]

If any such "fraud" occurred, it had to be during the St. Regis Hotel incident when the parties got involved in a disagreement over whether Sterling was to take its interest in its own name or in Chamberlain's name as trustee. Otherwise stated, the argument centered around the mechanics by which Sterling's interests were to be held. A more classical factual case for the application of economic duress might have existed had Chamberlain and Jett rejected Sterling's claim for any interest whatsoever in the transaction; and Sterling had reacted by threatening to "blow the deal" between Jett and Chamberlain on the one hand and Gulf on the other by disclosing to the Chase Bank the threat of litigation. Instead, the facts disclose that the bargaining between the parties following the dispute actually resulted in more of a compromise on the part of Sterling than on the part of Jett and Chamberlain. Sterling ultimately agreed to take less than 1/3 interest in the total transaction and agreed to hold such interest through a trustee (Zink instead of Chamberlain).

Nevertheless, Chamberlain's group contends that the trial court could have found that the total default on the part of Sterling to assist in any of the financial arrangements, having already been rejected by Gulf as the operating company of the Citronelle oil field, constituted a termination of any joint adventure contract; and that Jett and Chamberlain were no longer under obligation to give up a 1/3 interest to Sterling; and that, under the circumstances, Sterling wrongfully coerced Jett and Chamberlain into an arrangement beneficial to Sterling out of proportion to its true interest.

■ Assuming, arguendo, that we could uphold the trial court's finding of invalidity on the ground of economic duress, we are yet faced with the appellants' contention of ratification. The issue of economic duress as a defense to the validity of the Sterling Agreement was asserted eight years after the contract and four years after the litigation began. The only conceivable basis for excusing the long delay in asserting the economic duress contention would be the continuation of the fraud.[8] All the evidence is to the contrary. The very parties with whom Sterling was allegedly dealing in its perpetration of the threats and coercive acts (Equity, Chase Bank, and Gulf) were made fully aware of Sterling's interest even before the Sterling Agreement was finalized, and supplemental agreements were entered into with each of the financial institutions involved regulating their respective interests.

Chamberlain's group contends that the threat of litigation by Sterling, while foreclosure was imminent during the lean years of 1959, 1960, and 1961, served as a circumstance which continued the coercive acts and excused their failure to repudiate the contract earlier. We find no compe-

---

6. Juzan v. Toulmin, 9 Ala. 662, 44 Am.Dec. 448 (1846). See also later cases collected under 5 Ala.Dig., Contracts, §§ 94, 95, and 96.

7. Our somewhat summary handling of this issue is not to be construed as a rejection of the doctrine of economic duress and busi-

ness compulsion; we simply defer fuller treatment to a more appropriate case.

8. See Motor Equipment Co. v. McLaughlin, 156 Kan. 258, 133 P.2d 149 (1943); and Averill Machinery Co. v. Taylor, 70 Mont. 70, 223 P. 918 (1923).

tent testimony to support any factual basis for this contention. As early as October, 1960, and again in January, 1961, it was Chamberlain who specifically threatened to file a bill for declaratory judgment against Sterling relating to differences of interpretation as to Sterling's interest in the operating leases (§ 6 of the Sterling Agreement). Chamberlain's group also contends that the delay between the filing of the Pack-Kahn action in 1963, to the date of his cross bill asserting economic duress for the first time in 1967, is excused on the basis of the time lapse occasioned by the procedural maneuvering over the forum in the federal courts; and that his cross bill was seasonably filed following the remand after the first Jett v. Zink appeal.

In the same vein, Chamberlain contends further that his cross bill alleging incapability of performance for vagueness stands on the same footing as his claim of invalidity on the grounds of economic duress and violation of the Rule Against Perpetuities insofar as the timeliness of asserting such contentions. There is a distinction, however, in that no legal onus of immediacy rested upon Chamberlain with respect to his other contentions claiming unenforceability. Such is not the case as to his contention of invalidity on the ground of economic duress, and this for the reason that, under the facts here presented, the doctrine of ratification operates only in the context of this latter contention.[9]

■ Although the law of economic duress has not been fully developed by our case law, this is nonetheless a species of fraud; and it is well established by our cases that one who would void a contract for fraud must assert such claim at the earliest opportunity. Dusenberry v. First National Bank of Birmingham, 271 Ala. 207, 122 So.2d 716 (1960); Southern

States Fire & Casualty Ins. Co. v. De Long, 178 Ala. 110, 59 So. 61 (1912); Royal v. Goss, 154 Ala. 117, 45 So. 231 (1907). While no arbitrary rule exists for such determination, the record taken as a whole—viewed most favorably to Chamberlain—forces us to conclude that the time of filing of the Jett-Chamberlain suit (the first of the three actions) was the *last* opportunity to seasonably assert any claim for fraud in avoidance of the contract.

## 3. THE DOCTRINE OF UNCLEAN HANDS

■ The doctrine of unclean hands, while applicable to a defendant seeking affirmative relief (Malone v. State ex rel. Gallion, 285 Ala. 493, 234 So.2d 32 (1970)), had no field of operation under the pleadings and proof here presented for two reasons:

First, it is the Chamberlain group who seek to invoke the maxim and it is they who seek the relief of equity to cancel the contract with Sterling and reap its full benefits. Sterling's pleading, styled a "Cross Bill", is but an answer, praying for a finding of validity of the agreement—the same relief to which it would have been entitled, if any, under an answer to the original bill and Chamberlain's cross bill.

Second, the doctrine of unclean hands cannot be applied in the context of nebulous speculation or vague generalities; but rather it finds expression in specific acts of willful misconduct which is morally reprehensible as to known facts. Weaver v. Pool, 249 Ala. 644, 32 So.2d 765 (1947). This is not to say that it was incumbent upon the trial court to specify the particular conduct, but its finding must be based upon competent evidence of specific acts or course of conduct reproved by the doctrine.

---

9. This is not to say that the doctrine of ratification (or acquiescence) has no field of operation generally as to a defense of vagueness. Certainly, parties may expressly or impliedly ratify, or by a course of conduct acquiesce in, otherwise vague language in a contract; but here, as we have seen, Chamberlain raised this issue of vagueness as to the operating leases provision in October, 1960.

The only claim of unclean hands, which finds any competent evidentiary support, is contained in the context of appellees' contention of fraud in the form of economic duress. As we have already observed, the "economic duress" principle is at best of doubtful application; but, again, assuming the strongest possible presumptions in favor of appellees' contention, we, nevertheless, are committed to the proposition that the "unclean hands" doctrine will not be applied contrary to the rules of equity jurisprudence. Weaver v. Pool, supra.

In other words, the operative legal incidents of the principle of economic duress, including ratification and acquiescence, cannot be curtailed—and thereby rendered inoperative—simply by calling such species of fraud by another name—unclean hands. When these rules are applied to the case at bar, to hold otherwise would be to effectively eliminate the principle of ratification in the name of "unclean hands", where the facts disclose that the contract cannot be invalidated on the ground of fraud due to its ratification as a matter of law.

### 4. THE RULE AGAINST PERPETUITIES

The "Rule Against Perpetuities" defense was injected into the litigation by amendments filed by the Chamberlain group after the first six weeks of trial had been concluded. While not procedurally fatal, this contention seems almost too void of substance to merit our attention. Chamberlain refused to execute and deliver the Sterling Agreement until the trust agreement between Sterling and its trustee, Zink, the exact terms of which were dictated by Chamberlain, had been fully executed, made a part of, and incorporated into the Sterling Agreement. This trust agreement provides inter alia:

"That this trust may be terminated upon the written consent of all the contracting parties to the said agreement of May 1, 1959 (Sterling Agreement), or its succes-

sors in interest but in no event shall it exist for the period greater than twenty-one (21) years from the effective date hereof."

If ever an agreement was purposefully, and artfully, drafted to avoid the operation of the Rule Against Perpetuities, this was such a document; and, in view of its express language, any discussion of the various aspects of the rule would be merely an academic exercise and add nothing to the body of the law. See Crawford v. Carlisle, 206 Ala. 379, 89 So. 565 (1921).

After allowing all reasonable presumptions in favor of the correctness of the ruling of the trial court, we are constrained to say that the judgment is without any competent supporting testimony and cannot be affirmed as to any of the appellees' first four contentions heretofore discussed. Ray v. Richardson, 250 Ala. 705, 36 So.2d 89 (1948); Richards v. William Beach Hardware Co., 242 Ala. 535, 7 So.2d 492 (1942).

### 5. VAGUENESS, INDEFINITENESS AND UNCERTAINTY

We now proceed to address ourselves to the last contention made by appellees that the provisions of the agreement purporting to give interests to Sterling are vague, indefinite and uncertain.

It is a cardinal principle that, where testimony is taken ore tenus, the findings of facts made and entered by the trial court will be sustained unless they are clearly and palpably wrong or without supporting evidence, or are manifestly unjust. Renfroe v. Weaver, 285 Ala. 1, 228 So.2d 764 (1969). Where the trial judge's ruling is grounded on no specific ground, his judgment must be sustained on appeal if any good ground is presented. Martin v. Birmingham Southern R. Co., 250 Ala. 583, 35 So.2d 339 (1948).

Upon review of the record in this cause, we are of the opinion that there was ample evidence to support a conclusion by

the trial judge that the agreement was invalid and unenforceable on the ground that certain essential provisions in the agreement were vague and uncertain.

First, it appears clear that the issue of the uncertainty of the agreement was properly before the trial court and was, in fact, tried by the parties. Both the original complaint as amended and Chamberlain's cross-complaint contain the following allegations:

"a. The so-called Agreement is conflicting, ambiguous, indefinite and uncertain and cannot be specifically performed, for it contains no specific agreement on (1) monthly operating costs * * * (2) the wellhead price * * * (3) the rate of production * * * and as a result the agreement provides no means of determining the value of the 25 percent working interest referred to in the Sterling Agreement, nor for computing an override which would be equal thereto in value * * *."

And in their prayer for relief, appellees contend that:

"6. The Sterling Agreement, insofar as it purports to bind Jett and Chamberlain to convey an interest in the former Gulf producing properties, as that term is sought to be defined in the so-called Sterling Agreement, is void for uncertainty and indefiniteness which cannot be cured through construction, or by the intervention of arbitrators, as the parties omitted to include and agree upon essential elements which it was necessary for them to include and agree upon in order to create a valid, legally binding and specifically [enforceable] [performable] agreement."

Appellant Sterling expressly joined issue with appellees on the question of uncertainty in its "Additional Defensive Pleading." In its answer, Sterling admitted that the agreement did not contain specific agreement on the three items enumerated in the complaint, but alleged in defense that the agreement was subject to both the Federal Arbitration Act, 9 U.S.C. § 1, and to Chapter 19, Arbitration and Award, of Title 7, Code of Alabama 1940 (Recompiled 1958), §§ 829–844.

It appears that the trial court did reach the question of the uncertainty of the agreement. The pre-trial order of May 3, 1971 states that:

"* * * [I]t is ORDERED and DIRECTED by the Court that the trial of the case shall proceed first to a determination to the issues of the validity of the 'Sterling Agreement', secondly, to a consideration of the issues relating to the construction of the 'Sterling Agreement', and thirdly, to the issues relating to accounting only if and after the Court has concluded that the 'Sterling Agreement' is valid and after the issues relating to construction have been determined by the Court."

In the interlocutory order of July 10, 1971, ending the first phase of the trial, the trial judge indicated that the court would then proceed to a determination of "all controversies between the parties with respect to the meaning and enforceability *vel non* of the specific provisions of the Sterling Agreement."

After a full trial, which included extensive testimony on the issue of the uncertainty of certain provisions of the agreement, the trial judge issued a final decree stating:

"The Court is further of the opinion after consideration of *all the said legally admissible evidence*, the oral arguments of the attorneys for the respective parties, and the written briefs which have been submitted in this cause, that said agreement is not valid and enforceable." (Emphasis supplied)

We, therefore, conclude that the issue of uncertainty was considered by the trial court. Moreover, we are convinced that there was ample evidence before the trial court to support a conclusion that essential terms of the agreement were too vague and uncertain to constitute a binding con-

tract. Chamberlain testified that a "supplemental agreement" defining certain terms and setting certain production and price figures would be necessary to give any meaning to the agreement; that he "suspected" even at the time of entering into the agreement that there was no such thing as an ascertainable override equal in value to a 25% working interest absent further agreement of the parties on a number of other factors; that the agreement was "something substantially less than an agreement"; and, that paragraph 7(c) was "so indefinite that it is unenforceable." Raymond Corcoran testified that he had seen other documents attempting to give similar overriding royalties, but that they usually have a good bit more definition of terms for computing same. B. P. Huddleston, a consulting petroleum engineer, testified that he could not convert the 25% working interest into an overriding royalty interest without information from the parties with regard to the definition of "value," the "starting date," instructions on "type of reserves," instructions on escalation of the future price of crude oil, relationship of the Sterling override to the Gulf override, and probably other items. William Horner, another petroleum engineer, similarly testified as to various factors which were needed to make the conversion but which were not specified in the agreement, characterizing an overriding royalty interest without specification of such factors "a leap into fantasy."

■ Even though appellant Sterling produced expert witnesses who testified that they could determine the interest specified by paragraph 6, there was sufficient evidence to support a conclusion by the trial judge that the meaning of paragraph 6 was so uncertain as to be invalid. Furthermore, contrary to Sterling's contentions, such uncertainty cannot be cured by arbitration. While the agreement itself made provision for arbitrators, it is well-settled law in this state that courts cannot specifically enforce an agreement to submit a controversy to arbitration. Title 9, § 55, Code of Alabama 1940 (Recompiled 1958).

We, therefore, conclude that the judgment of the trail court declaring the Sterling agreement invalid and unenforceable is due to be affirmed.

### THE 2½% INTEREST FROM JETT TO ZINK

The trial court found that Zink had wrongfully extracted from Jett a 2½% interest in the transaction for a nominal consideration of $2,000. This occurred in April of 1959. In 1964, after the parties were already in litigation, Jett repurchased this 2½% interest from Zink for $141,921.-73. Sterling learned of this entire side deal for the first time through an amended pleading by Jett seeking a return of his money. Zink subsequently, under pressure of disbarment from Sterling, paid $140,000 of this resale price to Sterling. By further amendment, Jett then claimed a refund of the $140,000 from Sterling. The court found that Zink's wrongful actions (the original extortion) were ratified by Sterling when it required Zink to pay to it $140,000 and decreed that Sterling pay to Jett $140,000 with interest from June 27, 1967—the date of its receipt of its money from Zink.

The immediate facts leading up to the repurchase of this 2½% interest by Jett from Sterling show that Chamberlain purchased Jett's interest in 1964, and, as a condition to this purchase, he required Jett to reacquire for Chamberlain Zink's 2½% interest. The purchase price was arrived at by simply applying the same ratio of value used by Chamberlain in purchasing Jett's interest.

These facts render impossible our efforts to uphold the lower court's decree returning to Jett from Sterling the $140,000 sum. Indeed, appellees do not claim that there was any wrongful action connected with the repurchase of the 2½% interest by Jett from Zink; and the evidence does not contain even a scintilla that the resale transac-

tion between Jett and Zink was tainted with any coercion, pressure, misrepresentation, or other wrongful act on the part of Zink at that time. All of the parties concede that Sterling knew nothing of this side deal between Zink and Jett, including the repurchase, until well after the fact.

■ Conceivably, if Zink had sold this 2½% interest to a third party and Sterling had made Zink pay it the purchase price therefor, or if Jett had not repurchased from Zink and had included in his cross claim a prayer for rescission, a different situation might be presented in favor of the trial court's holding. However, the development of our case law on the principle of ratification compels the conclusion that one who treats the contract as in force through express affirmance by word or deed, after full knowledge of the alleged fraud, defeats the right of rescission. Where the parties, as here, were already in litigation and Jett voluntarily paid Zink approximately $142,000 for the repurchase of the 2½% interest, ratification of the initial wrongful act of extracting the 2½% interest unquestionably results as a matter of law. Nelson v. Darling Shop of Birmingham, Inc., 275 Ala. 598, 157 So.2d 23 (1963); Stephenson v. Allison, 123 Ala. 439, 26 So. 290 (1899).[10]

### The Cross Appeal

■ Chamberlain's group cross assigns error in the awarding of a money judgment in favor of Sterling for a "finders fee" and "reasonable compensation" for services rendered in the Gulf-Jett-Chamberlain transaction. Such award, argues the cross appellants, is inconsistent with the Court's finding of unclean hands. Our conclusion, heretofore stated, as to the contention of unclean hands disposes of this cross assignment of error. After careful consideration of each of appellees' cross assign-

ments of error, we find no error to reverse on cross appeal.

### CONCLUSION

We summarize our conclusions as follows:

1. Sterling's plea in abatement based upon the prior pendency of the action in federal court was properly denied.

2. The federal court decree of November 3, 1966, granting Sterling's motion for summary judgment on the issue of Sterling's qualifying to do business, is res judicata in the instant appeal.

3. There is insufficient evidence in the record to support the judgment of the trial court on the grounds of economic duress, unclean hands and the Rule Against Perpetuities.

4. There is sufficient evidence in the record to uphold the judgment of the trial court in declaring the Sterling Agreement invalid and unenforceable on the ground of vagueness, indefiniteness and uncertainty of certain essential provisions of § 6.

5. The trial court correctly granted Sterling a finder's fee.

6. The trial court erred in awarding to Jett the sum of $140,000.

It is, therefore, that we conclude that the decree of the trial court should be affirmed insofar as it adjudges the Sterling Agreement to be invalid and unenforceable and that the decree should be reversed insofar as it awards Jett the sum of $140,000. Judgment is here rendered accordingly.

Affirmed in part. Reversed and rendered in part.

MERRILL, BLOODWORTH, and JONES, JJ., concur.

---

10. The ratification here referred to is not to be confused with the alleged ratification of Zink's conduct by Sterling, but rather this reference is to Jett's ratification of the original transaction.

COLEMAN and HARWOOD, JJ., concur in the result.

MADDOX, J., concurs specially.

HEFLIN, C. J., and McCALL and FAULKNER, JJ., recused themselves.

MADDOX, Justice (concurring specially).

I concur that the trial court had before it sufficient evidence upon which to find the Sterling Agreement was invalid and unenforceable because it was vague and uncertain. Therefore, I concur fully in this portion of the opinion. Nevertheless, I also think that the court's finding that the agreement was invalid and unenforceable could be sustained on the ground that Sterling was guilty of "unclean hands."

Implicit, if not explicit, in the final decree of the court is a determination that Sterling was guilty of "unclean hands" both prior to the execution of the Sterling Agreement and after the execution of the Sterling Agreement. I think there is sufficient evidence to support this finding.

"Clean hands" refers to willful misconduct. Equity will consider the conduct of the adversary, the requirements of public policy and the relation of the conduct to the subject matter of the suit. Weaver v. Pool, 249 Ala. 644, 32 So.2d 765 (1947).

Sterling's principal argument is that it entered into a joint venture with Chamberlain to acquire the Gulf properties. If Sterling was a joint adventurer with Chamberlain and Jett in the Gulf acquisition—as it argues it was—the general rule is that joint adventurers owe one another the duty to observe the *utmost good faith* in all that relates to their common interest, from the beginning of the negotiations for the formation of the enterprise to its termination. See Van Heuvel v. Roberts, 221 Ala. 83, 127 So. 506 (1930); Saunders v. McDonough, 191 Ala. 119, 67 So. 591 (1914); 48 C.J.S. Joint Adventures § 5, p. 824.

The trial court could have found from the evidence that Sterling failed to exercise good faith, when in April, 1959, Sterling, after having failed to secure the financing for the Gulf acquisition and being aware that Gulf would not sell if Sterling held an operating interest, threatened to "blow the deal" by contacting the financiers from which Chamberlain had commitments. There was substantial evidence that Sterling participated in litigation against Chamberlain, which litigation, if successful, would have diminished Sterling's profits in the properties in which it now claims an interest. Sterling contends that its failure to carry out its obligations would not terminate its right to share in the profits of the joint venture, citing Saunders v. McDonough, 191 Ala. 119, 67 So. 591 (1914). Assuming Sterling correctly construes *Saunders*, its argument would be applicable only if the court had refused to give Sterling anything for its contribution to the joint adventure. The trial court gave Sterling a finder's fee and its expenses, plus interest. I cannot say that the amount awarded is plainly and palpably wrong. In fact, I think there was sufficient evidence for the trial court to conclude that at the time of the Gulf acquisition, Sterling had contributed its services as a finder, and as a guarantor of the $1,500,000 Waldron obligation (Sterling never became obligated), and other services in connection with the negotiations leading up to the acquisition. The decree attempts to make Sterling whole for this contribution, in my opinion.

Consequently, I concur in the affirmance of the judgment on the cross-appeal and reject the cross-appellants' arguments that Sterling should get nothing because the court found it to have "unclean hands," since I believe the "clean hands" doctrine has its limitations.

In Weaver v. Pool, supra, this Court commented on the limitation of the "unclean hands" doctrine, as follows:

"The maxim also has its limitations, and will not be allowed to work injustice

and wrong, nor be applied contrary to the rules of equity jurisprudence. 30 C. J.S. Equity § 98. This court recognized such limitation in Harris v. Harris, 208 Ala. 20, 93 So. 841, where is found an extensive quotation from the Wisconsin court in Clemens v. Clemens, 28 Wis. 637, 9 Am.Rep. 520, and as appropriate here is that part of the quotation which reads as follows:

" 'Though guilty of a wrong or transgression of the law in one particular, a party does not become an outlaw, or forfeit his right to legal protection in all others, nor lay himself open to the frauds and machinations of others to be practiced and perpetrated against him with impunity.' "

I also concur in the result which reverses the judgment of the trial court awarding Jett $140,000 against Sterling.