Rel: December 19, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2025-0024

_____

## Michael W. Dendy and Dendy Investment Group, LLC

### v.

## James Ryan, Jim Durbin, Eric Newman, Todd Carroll, Gail Kappler, and The Architectural Committee of the River Pointe Subdivision

### Appeal from Marshall Circuit Court
### (CV-22-900124)

BRYAN, Justice.

Michael W. Dendy and Dendy Investment Group, LLC, appeal from

a judgment of the Marshall Circuit Court ("the trial court") in favor of

James Ryan, Jim Durbin, Eric Newman, Todd Carroll, Gail Kappler, and the Architectural Committee of the River Pointe Subdivision. For the reasons explained below, we affirm the trial court's judgment.

<u>Background</u>

In April 2022, Ryan, Durbin, Newman, Carroll, Kappler, and the Architectural Committee of the River Pointe subdivision ("the AC") commenced this action against Dendy and Dendy Investment Group, LLC, in the trial court seeking declaratory and injunctive relief. Ryan, Durbin, Newman, Carroll, and Kappler own property in the River Pointe Subdivision ("River Pointe"). Ryan, Durbin, Newman, Carroll, Kappler, and the AC are hereinafter referred to collectively as "the River Pointe plaintiffs." Dendy and Dendy Investment Group, LLC, are hereinafter referred to collectively as "the Dendy defendants."

As finally amended, the River Pointe plaintiffs' complaint alleged that the Dendy defendants had engaged in residential construction on two parcels of real property located within River Pointe -- Lot 7 and Lot 8. According to the River Pointe plaintiffs, the Dendy defendants had lacked a building permit for the construction, the construction did not conform to the plans that had been approved by the AC, and the

construction violated certain municipal building codes that had been adopted by the City of Guntersville.

The Dendy defendants answered the complaint and asserted several counterclaims, including a request for declaratory relief. In August 2023, the River Pointe plaintiffs moved for a summary judgment regarding all the Dendy defendants' counterclaims. The trial court granted the River Pointe plaintiffs' summary-judgment motion.

The trial court conducted a bench trial on June 25, 2024. After the trial, the parties requested that the trial-court judge visit and inspect the houses being constructed on Lot 7 and Lot 8 and view the "character" of River Pointe. Thereafter, the trial-court judge inspected the houses on Lot 7 and Lot 8 and drove through River Pointe outside the presence of the parties or their attorneys.

On October 4, 2024, the trial court entered a lengthy judgment making the following pertinent findings of fact:

> "[River Pointe] is a residential subdivision located in Guntersville …. [It] was created in 1998, and the entire subdivision is encumbered by certain restrictive covenants found in the Declaration of Covenants, Conditions, and Restrictions of River Pointe Subdivision (hereinafter referred to as 'River Pointe Covenants,' which were introduced and admitted … at trial).

"… The construction on Lot 7 and Lot 8 of the subdivision is at the heart of the controversy in this matter, and the River Pointe Covenants control and restrict what the [Dendy] defendants … are able to do and not do with the subject lots within the subdivision.

"… The subdivision plat, description, and other necessary documents for the subdivision, including the River Pointe Covenants, have been filed and recorded in the Probate Court of Marshal County …. The River Pointe Covenants provide, in part, as follows:

"'Now therefore, declarant hereby declares that all of the properties shall be held, sold and conveyed subject to the following easements, restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of, and which shall run with, the properties and be binding on all parties having any right, title or interest in the properties or any part thereof, their heirs, successors, and assigns, and shall inure to the benefit of each owner thereof.'

"… At trial, attorney David Jones testified concerning his representation of property owners who subdivided River Pointe and his preparation of all documents, including the River Pointe Covenants for the subdivision. Attorney Jones testified that the River Pointe Covenants are not overly restrictive or burdensome but were standard covenants and even routine.

"[The Dendy defendants] are the owner(s) of Lot 7 and Lot 8 in the subdivision and one or both defendants are responsible for the construction of the structures on Lot 7 and Lot 8 of the subdivision.

4

"… At trial, the [Dendy] defendants stipulated to having known about and being aware of the River Pointe Covenants as relates to Lot 7 and Lot 8.

"… With knowledge of the River Pointe Covenants, [the Dendy] defendants began construction of two separate structures on said lots, one on Lot 7 and one on Lot 8, which [the River Pointe] plaintiffs at trial contended violated the River Pointe Covenants.

"… The River Pointe Covenants provide, in pertinent part at Article Four (4) -- Land Use, Section 1(c):

"'Construction Plans. Except for Lots 24 and 37 which plans have been preapproved by declarant, no improvement shall be commenced, erected, placed, altered, added to or improved on any lot until a complete set of the construction plans and specifications, and a plan showing the location of any structure and all improvements on the lot have been submitted to and approved, in writing, by the [AC]. The set of plans will be retained by the [AC] and shall include floor plans, exterior elevations, material details, setting and landscaping plans. The [AC] shall have responsibility to ensure that no improvement whether building construction or landscaping, shall be initiated unless the quality and appearance of such improvement is compatible with neighborhood standards. The [AC] shall have the right to refuse to approve any plans or specifications or landscape plans which are not reasonably suitable or desirable in its opinion for aesthetic or other reasons, and in so passing upon such plans, specifications and landscape plans and without any limitation of the foregoing, it shall have the right to take into consideration the suitability of the proposed building or other

5

structure, and of the materials of which it is to be built, the site upon which it is proposed to erect the same, the harmony thereof with the surroundings and the effect of the building or other structure as planned, on the appearance from neighboring property. Notwithstanding that improvements meet or exceed specified minimum size requirements; the quality and attractiveness of every improvement must also meet high neighborhood standards and the [AC] is hereby granted broad discretion in judging the compatibility of proposed improvements for the neighborhood. In any case, it is intended that the [AC] will not approve plans, materials or specifications that do not conform to the following requirements: ….'

"The requirements include, but are not limited to, minimum size, ceiling height, exterior grade, exterior materials, windows and doors, roofing materials, air conditioner, fencing, screen porches, screen material, site location, and garages.

"… At trial, … Dendy, a home builder by trade, who has three additional lots at the subdivision, acknowledged that he was aware and had actual notice of the above River Pointe Covenants before he began construction on the structure now located on Lots 7 and 8, and his attorney of record stipulated to the same.

"… In approximately January 2021, [the Dendy] defendants submitted two separate complete set of construction plans and specifications and a plan showing the location of the proposed structures and all proposed improvements on Lots 7 and 8 to the [AC] for approval. These submissions were filed by [the Dendy] defendants pursuant to the River Pointe Covenants. The plans [were] introduced and admitted into evidence. The [AC] considered the plans, and

they were approved by the [AC] on or around February 4, 2021. The approval by the [AC] allowed [the Dendy] defendants to proceed with the construction of the two different houses on Lots 7 and 8 according to the complete plans submitted [to] and approved by the [AC].

"… Had the structures been constructed as contained in the construction plans approved by the [AC], one would assume this action would not have been instituted against [the Dendy] defendants. However, after approval of the plans by the [AC], [the Dendy] defendants changed the plans and began construction of structures on Lots 7 and 8 which did not conform to the plans submitted. At no time after approval of the initial construction plans by the [AC] did [the Dendy] defendants submit new or amended construction plans with all the requirements to the [AC] in order to seek approval for any such changes/amendments after the [AC] approved the original house plans, which were later abandoned in the construction process by [the Dendy] defendants.

"… Dendy testified at trial that he did not build the two approved houses on Lots 7 and 8 because River Pointe Drive was 'in the wrong place.' He also stated he did not build the houses because of the location of the City's setback lines.

"… It was established at trial that, as construction progressed on Lots 7 and 8, it became apparent that the structures under construction on Lots 7 and 8 did not conform to the construction plans submitted and approved; the construction had not been approved by the [AC]; and … did not resemble any plan submitted to the City or the [AC. The AC] put [the Dendy] defendants on notice and asked that [the Dendy] defendants stop construction.

"… Phillip Bartlett, an engineer and draftsman, inspected the houses being constructed on Lots 7 and 8 approximately one week before the trial of the case. … Bartlett prepared a complete to-scale drawing of both houses

under construction on Lots 7 and 8, including each level, exterior and interior measurements, as well as the layout of rooms on each floor and such were admitted into evidence …. Bartlett also testified that he had examined every drawing, plan or diagram which [the Dendy] defendants had prepared or submitted to the City or to the [River Pointe] plaintiffs at any time. … Bartlett then testified that none of the plans, drawings, drafts, or diagrams that he reviewed matched the houses under construction on Lots 7 and 8.

"… River Pointe resident, Jay Ronca, testified that he had followed [the Dendy] defendants' activities on Lots 7 and 8 closely. He testified concerning erosion problems, public-safety problems, and the environmental problems arising out of [the Dendy] defendants' construction practices in the subdivision. Ronca also described the retaining wall at the back of Lot 8 having long, vertical and horizontal cracks and his observations that the retaining wall was bulging when he examined the wall before trial.

"… Jay Ronca also testified regarding the effect [that] the construction on Lots 7 and 8 had on the entire subdivision. He expressed his opinion that the houses under construction by [the Dendy] defendants on Lots 7 and 8 were not compatible with the other homes in the subdivision. He stated that the homes lacked any architectural detail and did not blend in with the neighborhood. … Ronca also stated that, in his opinion, the construction on Lots 7 and 8 diminished the value of his home at River Pointe.

"… On or about August 5, 2022, [the Dendy] defendants delivered a letter to the [AC] together with a hand-drawn sketch of one floor of a building …. [The Dendy] defendants requested approval of changes in the original plans, which had previously been approved by the [AC]. [The Dendy] defendants characterized the request for approval of changes as 'only an addendum to the previously submitted plans.' The letter requested that the [AC] approve the hand-drawn sketch

for the same structure to be built on Lots 7 and 8. The sketch only includes one floor of a three-floor structure and did not constitute a complete construction plan, as contemplated by the River Pointe Covenants. The [AC] declined the request and informed [the Dendy] defendants of [its] decision by a letter dated August 11, 2022 …. [The Dendy] defendants in doing so appeared to request to completely change the original house plans that had been approved. The River Pointe Covenants state expressly that 'no improvement shall be commenced, erected, placed, altered or added to, or improved on any lot until a complete set of construction plans and specifications have been approved in writing by the [AC].' (Emphasis added.) ….

"… Dendy refers to the request as an Addendum, but, in the context of contracts by definition, 'an addendum can only become a part of the original document once it has been accepted by both parties.' -- Merriam-Webster Dictionary.

"… Regarding [the Dendy] defendants' defense for building unapproved houses on Lots 7 and 8 during the trial, the following exchange occurred [between counsel for the River Pointe plaintiffs and Dendy]:

"'Q: … Do you have permission or have you obtained permission from the [AC] to construct those houses that are there today?

"'A. … No.

"'Q. … Mr. Dendy, what's marked as Plaintiff's Exhibit 17, do you recognize that as the house that's constructed on Lot 8?

"'A. … Yes.

"'Q. … All right. What about Exhibit 16? Is that the house --

9

"'A. … Yes.

"'Q. … -- on [Lot] 7?

"'A. … Yes.

"'Q. … Did the [AC] ever approve any houses that look like this?

"'A. … No, they didn't.

"'Q. … All right. So[,] if I understand it correctly, you contend that you're within your rights, after plans are originally submitted and approved, by the [AC], you can build anything you want to?

"'A. … I don't understand the question.

"'Q. … Well, you had plans for [Lot] 7 and [Lot] 8 approved, and they're in evidence. They're a complete set of plans and specifications. They were approved by the [AC]. After that, do you contend that you can build anything you want to on Lots 7 and 8 without regard for the [AC]'s approval?

"'A. … Yes.'"

Based on its factual findings, the trial court made the following determinations:

"Under Alabama law, when the language of a restrictive covenant is not 'of doubtful meaning and ambiguous,' the language of that covenant is entitled to be given the effect of its plain and manifest meaning. Thus, if there is no inconsistency or ambiguity within a restrictive covenant, the clear and plain language of the covenant is enforceable by

10

injunctive relief. That proposition of law is to take precedence over the disfavor that courts harbor toward restrictions of the use of land as a general matter. Maxwell v. Boyd, 66 So. 3d 257 (Ala. Civ. App. 2010). The language in the River Pointe Covenants is plain, clear, and in no way ambiguous. Furthermore, the [Dendy] defendants have not claimed in any way that the River Pointe Covenants are unclear, ambiguous, or difficult to understand. It is well established that the proper recording of an instrument in the probate court that relates to an interest in real property, such as the covenant documents, constitutes constructive notice to all the world of the contents of the instrument. Additionally, in this instance, the [Dendy] defendants were aware of the River Pointe Covenants and the restrictions imposed thereby. With that knowledge, [the Dendy] defendants began construction of one or more structures on Lots 7 and 8, which violate the clear and unambiguous language of the River Pointe Covenants, and such structures are not the same structure(s) approved by the [AC] as submitted by [the Dendy] defendants.

"The argument by [the Dendy] defendants that the River Pointe Covenants allow a property owner to seek and receive approval from the [AC] of a specific structure pursuant to a complete set of construction plans submitted, then allows said property owner to thereafter construct any structure on said property without further approval is totally absurd and not provided for in the plain language of the River Pointe Covenants. Clearly, one cannot seek approval, obtain approval of a specific set of construction plans, and then build any structure without reference to the approved plans. To do so would allow a River Pointe lot owner, or any subdivision lot owner anywhere with similar restrictive covenants, to submit plans for the construction one [a $1 million] home, receive approval from the governing body for a [$1 million] home, in this case the [AC], and then said lot owner build a [$100,000] home on the lot. The River Pointe Covenants specifically provide 'no improvement shall be commenced, erected, placed, altered, added to, or improved on any lot' until a complete set

11

of construction plans are submitted to and approved by the [AC].

"The law does not place the onus on the enforcer of restrictive covenants to warn violators that they may not be in compliance, particularly where the restrictive covenants require homeowners to gain preapproval of any improvements. And in this case, [the Dendy] defendants were aware of the River Pointe Covenants and built the structures on Lots 7 and 8 with knowledge that such structures were not the same structures approved by the [AC].

"Now and based upon the totality of the evidence received by the Court and the Court having viewed the structures being constructed on Lots 7 and 8, inside and out, during the site visit by the Court, the Court finds that the River Pointe Covenants do in fact control the [Dendy] defendants' construction activities on Lots 7 and 8 of the subdivision, and the language of the River Pointe Covenants are standard restrictive covenants commonly used in subdivisions around the State. Further, that the structures now on said Lots 7 and 8 do not conform to the construction plans approved by the [AC]. [The Dendy] defendants are ordered to fully comply with the River Pointe Covenants in all respects as it relates to the structures being constructed on Lots 7 and 8 in the subdivision. To the extent that the structures on Lots 7 and 8 can be built in strict compliance and in accordance with the 'complete set of the construction plans and specifications' as previously approved by the [AC], the [Dendy] defendants may continue constructing the home/structure as contained in the approved construction plans. Alternatively, [the Dendy] defendants may seek approval in compliance with the River Pointe Covenants by submitting a complete set of construction plans and specifications and construct any structure that is approved by the [AC] which otherwise conforms with the River Pointe Covenants. Any such attempt to seek and gain approval of the alternate construction plans concerning the existing

structure(s) on Lots 7 and 8 shall be sought within [30] days from the date of this order. Otherwise, [the Dendy] defendants are ordered to immediately submit a plan to the [AC] for the immediate removal of any structure(s) on Lots 7 and 8 which are currently standing and for which the [Dendy] defendants did not have approval, or have not gained approval, by the [AC]. All other relief not specifically addressed herein is denied."

The Dendy defendants filed a motion to alter, amend, or vacate the trial court's judgment pursuant to Rule 59(e), Ala. R. Civ. P. That same day, the Dendy defendants also filed a "motion to extend time to obtain [the AC's] approval of construction plans." In the latter motion, the Dendy defendants asserted that they had "submitted floorplans to [the AC] but need more time to resubmit those plans if the [AC] pushes back and requires updated plans."

The River Pointe plaintiffs filed a response to the Dendy defendants' Rule 59(e) motion and a response to the Dendy defendants' "motion to extend time to obtain [the AC's] approval of construction plans." In the latter response, the River Pointe plaintiffs asserted that the Dendy defendants had "failed to submit a complete set of construction plans and specifications to the [AC] for approval by the [AC] to construct or alter any structures on Lots 7 and 8 …." They continued:

13

"[The] Dendy [defendants] did in fact submit two sets of documents to a member of the [AC] within [30] days of the order. The documents do not constitute or even purport to be a complete set of construction plans and specifications for structures on Lots 7 and 8. … In [their Rule 59(e)] motion, [the] Dendy [defendants] describe[] the documents as floorplans along with engineering schematic[s] on how to correct the property's retaining wall. These two documents … are simply drawings by an unidentified individual depicting the exterior of the structures on Lots 7 and 8 as they stand today with a proposed floorplan[,] which was introduced at trial. In other words, [the] Dendy [defendants] ha[ve] done absolutely nothing to plan, rebuild, alter, or change the two houses on Lots 7 and 8 since the Court's Order.

"… The [AC] has met and considered the plans or documents … and … unanimously rejected and did not approve the plans …."

(Emphasis in original.)

The trial court entered an order stating that it had considered the Dendy defendants' Rule 59(e) motion and their "motion to extend time to obtain [the AC's] approval of construction plans" and the River Pointe plaintiffs' response to each motion. The order concluded: "[I]n light of the testimony and evidence before the Court from the trial of this matter, the [motions] are both hereby DENIED." (Capitalization in original.)

The Dendy defendants thereafter appealed to this Court. The Dendy defendants do not specifically challenge the trial court's denial of

14

their "motion to extend time to obtain [the AC's] approval of construction plans" on appeal.

Analysis

On appeal, the Dendy defendants argue that the trial court erred by failing to consider and apply the "relative-hardship test" in entering a judgment in favor of the River Pointe plaintiffs enforcing the restrictive covenants at issue ("the River Pointe covenants"). See Cole v. Davis, 383 So. 3d 646, 654 (Ala. 2023)("'[I]f, upon a balancing of the equities, a court determines that the harm resulting to one landowner from the enforcement of a restrictive covenant would be considerably disproportionate to the benefit received by the landowner seeking enforcement, a court may decline to afford the landowner seeking enforcement the equitable relief of an injunction to redress a breach of the restrictive covenant.'" (quoting Grove Hill Homeowners' Ass'n v. Rice, 90 So. 3d 731, 737 (Ala. Civ. App. 2011))). The Dendy defendants also argue that the doctrine of laches bars the relief sought by the River Pointe plaintiffs.

In response, the River Pointe plaintiffs argue that the Dendy defendants waived application of both the relative-hardship test and the

15

doctrine of laches by failing to properly assert them as affirmative defenses in the trial court. See Cole, 383 So. 3d at 654 ("[T]he relative-hardship defense is an affirmative one, and, thus, the burden is on the party asserting the defense."); and Sims v. Lewis, 374 So. 2d 298, 301 (Ala. 1979)(explaining that the doctrine of laches is an affirmative defense).

Before considering the merits of the Dendy defendants' substantive arguments on appeal, we must consider the River Pointe plaintiffs' contention that those arguments have been waived.

I. Waiver

"'The language of Rule 8(c)[, Ala. R. Civ. P.,] is mandatory. This court has held:

"'"[An affirmative defense] is required to be specially pleaded under Rule 8(c). See Nash v. Vann, 390 So. 2d 301, 303 (Ala. Civ. App. 1980). Under the Federal Rules of Civil Procedure, after which our rules are modeled, the consequences of a party's failure to plead an affirmative defense have been explained as follows:

"'"'If an affirmative defense is not pleaded it is waived to the extent that the party who should have pleaded the affirmative defense may not introduce evidence in support thereof, unless the adverse party makes no objection in which case the issues are enlarged, or

16

unless an amendment to set forth the affirmative defense is properly made.'

"'"2A J. Moore, Federal Practice § 8.27[3] at 8-251 (2d Ed. 1948). See Funding Systems Leasing Corporation v. Pugh, 530 F.2d 91 (5th Cir. 1976)."

"'Smith v. Combustion Resources Engineering, 431 So. 2d 1249 (Ala. 1983). See, also, Columbia Engineering International, Ltd. v. Espey, 429 So. 2d 955 (Ala. 1983).'"

Newman v. Howard, 239 So. 3d 1147, 1150 (Ala. 2017)(quoting Bechtel v. Crown Cent. Petroleum Corp., 451 So. 2d 793, 796 (Ala. 1984))(emphasis added). We first consider the River Pointe plaintiffs' waiver argument with regard to the relative-hardship test before turning to the doctrine of laches.

A. The Relative-Hardship Test

The Dendy defendants did not assert the applicability of the relative-hardship test in an answer. Instead, they raised the defense for the first time in a pretrial brief. The Dendy defendants' pretrial brief included more than four pages of argument regarding this Court's relevant precedent, including this Court's recent decision in Cole, supra. The Dendy defendants also attached to their pretrial brief a copy of a Court of Civil Appeals' decision that they contended supported their relative-hardship-test argument.

17

In Hayes v. Payne, 523 So. 2d 333, 334 (Ala. 1987), this Court explained:

> "'"[T]he substance of many unpleaded affirmative defenses may be asserted by pretrial motions. … Even as late as trial, if evidence relating to an unpleaded defense is introduced without objection, Rule 15(b)[, Ala. R. Civ. P.,] requires the pleadings to be treated as if they actually had raised the issue. However, if the record indicates that the unpleaded affirmative defense has not been tried by the 'express or implied consent' of the parties, the pleadings will not be treated as if they actually had raised the defense, and the court may decide not to permit the issue to be litigated." (Footnotes omitted.)'"

(Quoting Robinson v. Morse, 352 So.2d 1355 (Ala. 1977), quoting in turn 5 Wright & Miller, Federal Practice & Procedure § 1278).

On appeal, the River Pointe plaintiffs assert that the Dendy defendants' principal appellate brief "does not cite any specific sections of testimony in the transcript where testimony was given regarding relative-hardship discussion." The River Pointe plaintiffs' brief at 14.

However, in their own posttrial brief, the River Pointe plaintiffs summarized the evidence presented at trial and included an argument based on the Court of Civil Appeals' decision in Maxwell v. Boyd, 66 So. 3d 657 (Ala. Civ. App. 2010). In particular, the River Pointe plaintiffs argued that, "[in Maxwell, t]he Court of Civil Appeals rejected the

18

undue[-]hardship claim[,] stating, 'a specific application of the clean-hands doctrine is that a restrictive covenant should be enforced if a [d]efendant had knowledge of it before constructing an improvement contrary to its provisions, even if harm is disproportionate.'" The River Pointe plaintiffs did not object to the Dendy defendants' assertion of the relative-hardship test as an affirmative defense; they argued only that it did not apply, based on the evidence presented at trial.

As noted above, in its judgment, the trial court cited the Court of Civil Appeals' decision in <u>Maxwell</u> when reasoning as follows:

> "[I]f there is no inconsistency or ambiguity within a restrictive covenant, the clear and plain language of the covenant is enforceable by injunctive relief. That proposition of law is to take precedence over the disfavor that courts harbor toward restrictions of the use of land as a general matter."

The central issue in <u>Maxwell</u> involved the relative-hardship test. <u>See</u> <u>id.</u> at 261-63.

In their postjudgment motion, the Dendy defendants again included an argument regarding the relative-hardship test. In their response to the Dendy defendants' motion, the River Pointe plaintiffs argued as follows:

> "<u>[The] Dendy [defendants] raise the equitable princip[le]</u>
> <u>of the 'relative[-]hardship' doctrine as a defense</u>. To invoke

19

the equitable defense of relative hardship, [the] Dendy [defendants] require[] the possession of clean hands. This defense is not available to [the] Dendy [defendants] because [their] own wrongful conduct renders the assertion of the defense contrary to equity and good consci[ence]. <u>Maxwell v. Boyd</u> ....

"....

"… The relative[-]hardship defense is not available in this case because all the evidence on the trial of the case regarding relative[]hardship was within [the] Dendy [defendants'] own control. [The] Dendy [defendants] could have sought [the AC]'s approval before beginning any construction. [They] could have stopped the construction at any time; [they] could have submitted additional or new complete sets of construction plans and specifications at any time; but [they] did not, even with both actual and constructive knowledge of the violation of the [c]ovenant."

(Emphasis added.) Thus, the River Pointe plaintiffs did not argue that the Dendy defendants had waived the relative-hardship test by failing to properly plead it as an affirmative defense. Indeed, as noted, the River Pointe plaintiffs acknowledged that the defense had been "raise[d]."

Based on the foregoing, we conclude that, although the Dendy defendants did not assert the relative-hardship test as an affirmative defense in an answer, they raised the defense in their pretrial brief. Because the River Pointe plaintiffs did not object to the Dendy defendants' assertion of the defense at that time, the issues to be tried

20

were "enlarged" to include the applicability of the relative-hardship test. See Newman, 239 So. 3d at 1150. Therefore, the Dendy defendants did not waive the relative-hardship test as an affirmative defense.

### B. The Doctrine of Laches

Unlike the relative-hardship test, the record indicates that the Dendy defendants raised the doctrine of laches for the first time in their postjudgment motion. Although the trial court had discretion to consider the Dendy defendants' laches defense, it was not required to do. See Special Assets, L.L.C. v. Chase Home Fin., L.L.C., 991 So. 2d 668, 677-78 (Ala. 2007)("Although the trial court had the discretion to consider the merits of the statute-of-limitations defense, there is no indication that it did so, and we will not presume to the contrary. See Green Tree Acceptance, Inc. v. Blalock, 525 So. 2d 1366, 1369 (Ala. 1988)('[A] trial court has the discretion to consider a new legal argument in a post-judgment motion, but is not required to do so.')."). Accordingly, we will not consider the merits of the Dendy defendants' laches defense on appeal.

21

II. The Clean-Hands Doctrine

The Dendy defendants' argument regarding the relative-hardship test relies heavily on this Court's decision in Cole, supra. After the parties to this appeal had completed their briefing, this Court released its decision in Englund v. Dauphin Island Property Owners Ass'n [Ms. SC-2024-0414, Aug. 29, 2025] ___ So. 3d ___ (Ala. 2025).

In Englund, we discussed Cole as follows:

"Regarding permanent injunctions involving restrictive covenants, we have recently explained:

"'Our Court has previously recognized that, as a general matter, "restrictive covenants are not favored in the law and will therefore be strictly construed by this Court." Lange v. Scofield, 567 So. 2d 1299, 1301 (Ala. 1990). "All doubts must be resolved against the restriction and in favor of free and unrestricted use of the property." Id.

"'However, when the language of a restrictive covenant is not "of doubtful meaning [or] ambiguous," the language of that covenant "is entitled to be given the effect of its plain and manifest meaning." Laney v. Early, 292 Ala. 227, 231-32, 292 So. 2d 103, 107 (1974). "If 'there is no inconsistency or ambiguity within a restrictive covenant, the clear and plain language of the covenant is enforceable by injunctive relief.'" Hipsh v. Graham Creek Estates Owners Ass'n, 927 So. 2d 846, 848 (Ala. Civ. App. 2005)(quoting Carpenter v. Davis, 688 So. 2d 256, 258 (Ala. 1997)). That proposition of law takes precedence

22

over the disfavor that our Court has previously shown toward restrictions of the use of land. Laney, 292 Ala. at 231, 292 So. 2d at 106-07.

"'In Tubbs v. Brandon, 374 So. 2d 1358, 1361 (Ala. 1979), this Court stated:
"'"When a restrictive covenant is broken, ... an injunction should be issued because the mere breach of the covenant is a sufficient basis for interference by injunction. The right to enjoin such a breach will not depend upon whether the covenantee will be damaged by the breach. Reetz v. Ellis, 279 Ala. 453, 186 So. 2d 915 (1966)."'

"Cole v. Davis, 383 So. 3d 646, 653 (Ala. 2023)(emphasis omitted).

"....

"This Court recently summarized the relative-hardship test as follows:

"'Although, as noted earlier, the breach of a restrictive covenant is, by itself, enough to warrant the issuance of an injunction, in Lange [v. Scofield, 567 So. 2d 1299 (Ala. 1990),] this Court stated that enforcement of covenants running with land "'is governed by equitable principles, and will not be decreed if, under the facts of the particular case, it would be inequitable and unjust.'" 567 So. 2d at 1302 (quoting 20 Am. Jur. 2d Covenants, Conditions & Restrictions § 313 (1965)).

"'....

23

"'If "'the restrictive covenant has ceased to have any beneficial or substantial value'" or "'the defendant will be subject to great hardship or the consequences would be inequitable,'" a court, applying equitable principles, of equity will not enforce the covenant.  Id. (citation omitted).

"'In Lange, this Court explained:

"'"'The equitable enforcement of a restriction can be invoked only for the purpose of protecting the benefit which it was the object of the covenant to afford. If the restrictive covenant has ceased to have any beneficial or substantial value to the ... property, it can form no ground for equitable relief .... [I]f the defendant will be subject to great hardship or the consequences would be inequitable, relief will be denied.'"

"'Id. (citation omitted).'

"Cole, 383 So. 3d at 653-54.

"....

"Before this Court's decision in Cole, supra, the Court of Civil Appeals had used evidence of a party's knowledge of a restrictive covenant, whether actual or constructive, as a reason to deny application of the relative-hardship test.  See, e.g., Grove Hill Homeowners' Ass'n v. Rice, 90 So. 3d 731, 739 (Ala. Civ. App. 2011); Maxwell v. Boyd, 66 So. 3d 257 (Ala. Civ. App. 2010).  Those decisions indicating that knowledge could preclude consideration of the parties' relative hardships were based on application of the clean-hands doctrine.  See Grove Hill, 90 So. 3d at 739; Maxwell, 66 So. 3d at 261. …

"....

"In Cole, this Court explained that a party's knowledge is merely one factor for consideration in applying principles of equity to balance the relative hardships between the parties.

"'[T]his Court has not developed or applied a hard and fast rule preventing a party from relying on the relative-hardship defense in situations in which that party violated a covenant of which it had notice. Instead, a party's knowledge -- constructive or actual -- of a restrictive covenant should simply be one factor for a trial court's consideration in determining whether the resultant harm from enforcement of a restrictive covenant "would be considerably disproportionate to the benefit received by the landowner seeking enforcement" of the covenant. Grove Hill, 90 So. 3d at 737. See, e.g., id. at 742 (Bryan, J., dissenting)("I would hold that a trial court should consider a party's knowledge of a restrictive covenant as a factor in applying the relative-hardship test rather than holding that such knowledge precludes the application of the test."). Indeed, under virtually every circumstance, a property owner would have at least constructive notice of a recorded restrictive covenant, and thus the bright-line rule adopted by the Court of Civil Appeals would read the relative-hardship defense out of existence.'

"Cole, 383 So. 3d at 654-55."

___ So. 3d at ___.

On appeal, the Dendy defendants admit that they "knowingly violated [the River Pointe covenants] by not obtaining [the AC's] approval

25

for two $800,000+ houses' altered construction plans." The Dendy defendants' brief at 4. They also assert that "everyone agrees that 'none of the plans' the [AC] originally approved 'match[] the houses' Mr. Dendy built." The Dendy defendants' brief at 15. However, they argue that the trial court erred by relying on the Court of Civil Appeals' decision in Maxwell, given what this Court held in Cole. The Dendy defendants assert:

> "[W]hether a party had 'knowledge -- constructive or actual -- of a restrictive covenant' remains but 'one factor' in the equation. Cole, 383 So.3d at 655. With that in mind, this Court in Cole applied a 'relative-hardship test' even though the lot owner 'had actual knowledge' of the restrictive covenants. Id. at 650, 655. What mattered was well-rounded equity, not strict liability for a knowing violation.
>
> "At bottom, the [trial] court erred by applying strict liability for Mr. Dendy's knowing violation, ignoring the equity that Cole injected back into the equation. To correct it, this Court should vacate the [trial] court's ordered relief prescribing that inequity."

The Dendy defendants' brief at 14-15 (emphasis in original).

In Englund, we articulated Cole's pertinent holding as follows:

> "[I]n relevant part, Cole stands for the proposition that a party's knowledge of a restrictive covenant does not, as matter of law, foreclose that party from invoking the relative-hardship test as a defense to a claim seeking permanent injunctive relief. Put another way, such knowledge alone does not demonstrate unclean hands as a matter of law so as to

26

prevent a balancing of the factors under the relative-hardship test.

"In J & M Bail Bonding Co. v. Hayes, 748 So. 2d 198, 199 (Ala. 1999), we explained the following regarding the clean-hands doctrine:

"'This Court has recognized that one "who seek[s] equity must do equity" and "one that comes into equity must come with clean hands." Levine v. Levine, 262 Ala. 491, 494, 80 So. 2d 235, 237 (1955). The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when that party's own wrongful conduct renders the assertion of such legal rights "contrary to equity and good conscience." Draughon v. General Fin. Credit Corp., 362 So. 2d 880, 884 (Ala. 1978). The application of the clean hands doctrine is a matter within the sound discretion of the trial court. Lowe v. Lowe, 466 So. 2d 969 (Ala. Civ. App. 1985).'

"In Weaver v. Pool, 249 Ala. 644, 648, 32 So. 2d 765, 768 (1947), this Court stated:

"'[T]he [clean-hands] maxim refers to willful misconduct rather than merely negligent misconduct and must be morally reprehensible as to known facts. Furthermore, equity will consider the conduct of the adversary, the requirements of public policy and the relation of the misconduct to the subject matter of the suit and to defendant. 30 C.J.S., Equity, § 98.'

"See also Retail Devs. of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So. 2d 924, 932 (Ala. 2007)('"[T]he doctrine of unclean hands ... finds expression in specific acts of willful

misconduct"' that are '"morally reprehensible as to known facts." Sterling Oil of Oklahoma, Inc. v. Pack, 291 Ala. 727, 746, 287 So. 2d 847, 864 (1973)(citing Weaver v. Pool, 249 Ala. 644, 32 So. 2d 765 (1947)).').

"Thus, regarding whether the defendants can invoke the relative-hardship test as a matter of equity under the clean-hands doctrine, the question presented is not simply whether [the defendants] had knowledge of the restrictive covenants at issue or even whether [they] engaged in negligent misconduct. Instead, the question is whether the defendants' actions 'r[o]se to the level of morally reprehensible, willful misconduct.' Retail Devs., 985 So. 2d at 932. Moreover, the [plaintiff]'s conduct and its relation to the subject matter of the action are also relevant to the clean-hands inquiry. See Weaver, 249 Ala. at 648, 32 So. 2d at 768."

In their appellate brief, the River Pointe plaintiffs argue that, based on the evidence presented at trial, the trial court could have reasonably concluded that the Dendy defendants did not have clean hands and that, "[g]iven Dendy's actions, it would have been within the sound discretion of the trial court to deny [the Dendy defendants'] claims for equitable relief." River Pointe plaintiffs' brief at 21.

The Dendy defendants argue: "In today's world, Alabama courts must consider the relative hardship that enforcing a covenant will impose on a person, regardless of the person's state of mind when the violation happened." The Dendy defendants' brief at 2-3. To the extent that the Dendy defendants argue that the clean-hands doctrine has no bearing on

28

the availability of the relative-hardship test as an affirmative defense, our decision in Englund demonstrates otherwise.

In Englund, this Court reversed a circuit court's judgment that had improperly failed to apply the relative-hardship test. In so doing, we noted that the circuit court had not expressly found that the defendants had had unclean hands, but we "evaluate[d] the evidence presented to determine whether it could have supported such an implicit determination by the [circuit] court." ____ So. 3d at ____. We stated:

> "[B]ased on the evidence presented, the [circuit] court could not have properly concluded that the defendants were barred by the clean-hands doctrine from invoking the relative-hardship test in defense of the [plaintiff]'s action seeking a permanent injunction. Although, as already noted, the [circuit] court's judgment did not expressly make such a determination, to the extent that it did so implicitly, we conclude that its judgment in that regard is palpably erroneous or manifestly unjust. See Merchants Bank [v. Head], 161 So. 3d [1151,] 1154 [(Ala. 2014)]."

Id. at ____.

Like the circuit court's judgment in Englund, the trial court's judgment in this case did not expressly determine that the Dendy defendants' relative-hardship defense was barred by the clean-hands doctrine in those specific terms. However, it does appear that the trial court's judgment did determine that, based on the Dendy defendants'

29

conduct, they could not invoke the relative-hardship test as a defense to the River Pointe plaintiffs' request for injunctive relief.

Thus, we will evaluate the trial court's findings in this case and the evidence presented to ascertain whether it was within the trial court's discretion to deny application of the relative-hardship defense based on the clean-hands doctrine. In so doing, we remain mindful of the following standard of review:

> "'The ore tenus standard of review generally applies to judgments entered following a bench trial.' R & G, LLC v. RCH IV-WB, LLC, 122 So. 3d 1253, 1256 (Ala. 2013).
>
> "'Under the ore tenus standard of review, findings on disputed facts are presumed correct, and the trial court's judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust. Southside Cmty. Dev. Corp. v. White, 10 So. 3d 990, 991 (Ala. 2008). "'"The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'"'" 10 So. 3d at 991-92 (quoting Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So. 2d 924, 929 (Ala. 2007), quoting in turn Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005), quoting in turn Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)).'
>
> "Lawson v. Harris Culinary Enters., LLC, 83 So. 3d 483, 491 (Ala. 2011)."

Merchants Bank v. Head, 161 So. 3d 1151, 1153-54 (Ala. 2014).

After consideration of the trial court's findings and the evidence presented in this case, we conclude that the circumstances here are materially distinguishable from the circumstances of <u>Englund</u> and that, in this case, the evidence adequately supports a determination that the clean-hands doctrine barred any application of the relative-hardship test.

In <u>Englund</u>, it was undisputed that the defendants had obtained a permit from the Town of Dauphin Island ("the Town") to construct a house. However, the defendants had not obtained the approval of the Dauphin Island Property Owners Association ("the DIPOA") to build the house. Evidence was presented regarding the history of a "one-stop agreement" between the Town and the DIPOA, whereby the Town would deliver building-permit applications to the DIPOA for its review as well. We stated:

> "Rodney[, one of the defendants,] testified that he asked the Town's permit clerk whether it was necessary for him to deliver materials separately to the DIPOA. Rodney testified that she stated that the Town would deliver his materials to the DIPOA and that the DIPOA would be in touch with him. Although the DIPOA notes that the trial court could have disbelieved Rodney's testimony in this regard, we also note that the DIPOA did not present evidence that conflicted with Rodney's testimony. Indeed, other evidence confirmed Rodney's testimony. The head of the Town's permit department testified that it was, in fact, Town policy at the time to collect two sets of plans from applicants, one for the

31

Town and one for the DIPOA. He also stated that it was possible that a permit clerk had told Rodney that the Town would send a copy of his permit application to the DIPOA."

Englund, ___ So. 3d at ___.

We reasoned that the one-stop agreement had not wholly relieved the defendants from obtaining the DIPOA's approval in accordance with the applicable restrictive covenants, but we concluded that the totality of the evidence regarding the one-stop agreement did "not support a determination that the defendants' actions 'r[o]se to the level of morally reprehensible, willful misconduct.' Retail Devs. [of Alabama, LLC v. East Gadsden Golf Club, Inc.], 985 So. 2d [924,] 932 [(Ala. 2007)]." Id. at ___. We stated:

> "Even if the relevant evidence presented would support a conclusion that Rodney had acted carelessly and without sufficient diligence to obtain the DIPOA's approval before beginning construction and had, therefore, engaged in negligent misconduct, such misconduct is insufficient to support a finding of unclean hands. See Weaver [v. Pool], 249 Ala. [644,] 648, 32 So. 2d [765,] 768 [(1947)]."

Id. at ___.

By contrast, in this case, the trial court found that the Dendy defendants took the position that, after obtaining the AC's approval for a particular construction plan, they were instead free to construct

32

whatever they desired, without regard to the original construction plan approved by the AC and with awareness of the River Pointe covenants and the requirement that the AC approve any construction within River Pointe. The trial court characterized the Dendy defendants' position as "totally absurd" and stated that, "[c]learly, one cannot seek approval, obtain approval of a specific set of construction plans, and then build any structure without reference to the approved plans."

We acknowledge that evidence was presented in this case indicating that the original construction plan approved by the AC could not be precisely completed due to the misidentified location of an adjacent road and the location of certain setback lines required by the City of Guntersville. However, Dendy admitted at trial that the houses constructed on Lots 7 and 8 did not even resemble the original plans approved by the AC. We conclude that evidence of such intentional and deliberate actions by the Dendy defendants to obtain approval for one structure but to actually build an entirely different structure supports a determination that they had engaged in willful misconduct that was morally reprehensible as to known facts, as opposed to only careless or negligent misconduct. See Englund, ____ So. 3d at ____.

33

In <u>Englund</u>, we also noted that "the defendants' construction activities were not hidden or concealed from the DIPOA and the DIPOA did not immediately issue a stop-work order." <u>Id.</u> at ____. We further noted that, after receiving the stop-work order from the DIPOA, the defendants had engaged in minimal additional construction to prevent loss of materials but had otherwise stopped work on the house:

> "After the DIPOA filed suit, Rodney asked the Court's permission to proceed with limited additional work to prevent damage to the house. The DIPOA conceded, and the trial court granted that permission. Otherwise, the defendants have complied with DIPOA's stop-work order, such that the house has deteriorated during the progress of the court proceedings."

<u>Id.</u> at ____.

> By contrast, in this case, the trial court's judgment stated:

> "… It was established at trial that, as construction progressed on Lots 7 and 8, it became apparent that the structures under construction on Lots 7 and 8 did not conform to the construction plans submitted and approved; the construction had not been approved by the [AC]; and … did not resemble any plan submitted to the City or the [AC. The AC] put [the Dendy] defendants on notice and asked that [the Dendy] defendants stop construction."

The Dendy defendants, however, kept building. During direct examination, counsel for the Dendy defendants asked Dendy what he had done after the AC rejected his handwritten proposed alteration to his

construction plans. In referencing the location of the road that Dendy contended had been recorded incorrectly, thereby necessitating changes to his construction plans, Dendy replied: "Well, I knew the road was wrong. I tried to fix the problem, and <u>I just built. That's what I did</u>." (Emphasis added.)

On appeal, the Dendy defendants suggest to this Court that "no one ever said [that Dendy] should stop constructing" and so Dendy "kept building. For over two years he built these homes." The Dendy defendants' brief at 5. However, in support of this assertion, the Dendy defendants cite a letter from Ryan, the chairman of the AC, dated August 11, 2022. In the letter, Ryan stated, among other things:

> "The approval is required before construction is started. You are framing in a house without approval. … Any change must be presented to the AC for further approval. We are very concerned that you have not followed the procedures as outlined in the Covenant …. We strongly urge you to follow our Covenant …."

The Dendy defendants' assertion that the contents of Ryan's letter did not suggest that Dendy "should stop constructing" is, at the very least, a strained interpretation of the letter.

The Dendy defendants acknowledge that the River Pointe plaintiffs "su[ed] relatively quickly on Lot 8's construction" but state that they

"waited over a year after construction began before eventually suing about Lot 7." The Dendy defendants' brief at 18 (emphasis in original).[1] In support of this argument, the Dendy defendants cite the River Pointe plaintiffs' third amended complaint, which added allegations and requests for relief concerning Lot 7.

It is undisputed that the Dendy defendants were aware that the AC had not approved the house being constructed on Lot 7 and that the AC's approval was required for the construction of both houses. Thus, it is apparent that the Dendy defendants were aware of the AC's desire to enforce that restrictive covenant "relatively quickly." The Dendy defendants' brief at 18.

As noted, it is also undisputed that, during the pendency of this action concerning both Lot 7 and Lot 8, the Dendy defendants continued their construction activities. Unlike the defendants in Englund, who had "asked the Court's permission to proceed with limited additional work to

---

[1]The Dendy defendants make this argument in the context of a laches defense, which, as explained above, has been waived. However, in Englund, this Court noted that "the [plaintiff]'s conduct and its relation to the subject matter of the action are also relevant to the clean-hands inquiry." ____ So. 3d at ____. Therefore, we also consider the Dendy defendants' contentions concerning the River Pointe plaintiffs' conduct in our analysis regarding the clean-hands doctrine.

prevent damage to the house," ____ So. 3d at ____, the Dendy defendants contend that the River Pointe plaintiffs "let [Dendy] continue to construct" the houses here by failing to request a preliminary injunction, and they accuse the trial court of "greenlighting" a delay. The Dendy defendants' brief at 19.

In their reply brief, the Dendy defendants assert: "[P]unishing Mr. Dendy for not voluntarily incurring [a] pause's liability [to buyers and subcontractors] makes no sense and prejudices him for the [AC]'s failure to use the available litigation tools. At the end, voluntary cessation is a strategy, <u>not</u> a requirement." The Dendy defendants' reply brief at 13 (emphasis in original).

We emphasize yet again that, in making these arguments, the Dendy defendants concede that they were knowingly building structures that did not resemble the construction plans approved by the AC. In other words, not only did the Dendy defendants argue, as the trial court observed, that they should be permitted to construct whatever houses they choose despite having obtained approval for specific houses, they also insist to this Court that their decision to engage in such intentional misconduct amid ongoing litigation to enforce the covenants is irrelevant.

37

Furthermore, the Dendy defendants seem to suggest that the trial court's failure to stop them justifies their intentional misconduct.

Our consideration of the foregoing contentions and their implications do not undermine our conclusion that it was within the trial court's discretion to determine that the Dendy defendants' conduct in this case rose to the level of willful misconduct that was morally reprehensible as to known facts. See Englund, ____ So. 3d at ____.

Finally, we also note that, in Englund, we stated:

"The DIPOA argues on appeal that the Englunds intended to build wherever they wanted on Lot 23, regardless of any covenants enforced by the DIPOA. This certainly was the speculation of the DIPOA's own witnesses about Rodney's motives. However, they did not testify to anything they observed Rodney say or do that supported their opinions beyond the bare fact that he had knowledge that the DIPOA required an application. Thus, no other evidence shows that the Englunds' motive was to purposely and willfully violate the Silver Cay II setback requirement."

____ So. 3d at ____.

By contrast, as noted in the trial court's judgment in this case, Dendy himself testified regarding his position that he could obtain the AC's approval for one construction plan but instead build something entirely different. Thus, Dendy's own testimony supports a conclusion

that his motive was to purposely and willfully violate the River Pointe covenants.

## Conclusion

The Dendy defendants did not waive the relative-hardship test as an affirmative defense because the record indicates that they raised the defense before trial without objection from the River Pointe plaintiffs; therefore, the issues to be tried were expanded to include the applicability of the relative-hardship test.

However, the trial court's judgment indicates that it declined to apply the relative-hardship test based on the Dendy defendants' actions in this case. Based on our review of the trial court's findings and the totality of the evidence presented, we conclude that the evidence supports a determination that application of the relative-hardship test should have been barred in this case based on the Dendy defendants' willful misconduct that was morally reprehensible as to known facts. Accordingly, the trial court acted within its discretion in declining to apply the relative-hardship test under the circumstances of this case. Therefore, the trial court's judgment is due to be affirmed.

AFFIRMED.

Stewart, C.J., and Shaw, Wise, Mendheim, Cook, and McCool, JJ., concur.

Parker, J., concurs specially, with opinion.

Sellers, J., concurs in the result.

PARKER, Justice (concurring specially).

I agree that we should affirm the trial court's injunction ordering the Dendy defendants to obtain approval for their construction on Lots 7 and 8 or else remove any unapproved structures. I write specially to note a doctrinal question for future consideration: Is the relative-hardship test truly an affirmative defense? Or is it instead merely an element of a plaintiff's required showing to obtain an injunction?

To obtain a permanent injunction in Alabama, a plaintiff must show: (1) success on the merits, (2) irreparable injury in the absence of an injunction, (3) that the injunction will be compatible with the public interest, and -- critically, here -- (4) that the balance of the equities (that is, the relative hardships) favors issuance of an injunction. See, e.g., Tipp v. JPMC Specialty Mortg., LLC, 367 So. 3d 357, 363 (Ala. 2021) (quoting Sycamore Mgmt. Grp., LLC v. Coosa Cable Co., 42 So. 3d 90, 93 (Ala. 2010)). I assume this well-established framework applies to injunctions enforcing a restrictive covenant just the same as any other injunction.

Several of this Court's recent decisions, however, refer to the relative-hardship test as an affirmative defense -- at least in the context of restrictive-covenant enforcement. See, e.g., Cole v. Davis, 383 So. 3d

646, 654 (Ala. 2023). One such decision even notes the similarity between the relative-hardship test (as an affirmative defense) and the relevant "prong of the requirements for a permanent injunction." Englund v. Dauphin Island Prop. Owners Ass'n, [Ms. SC-2024-0414, Aug. 29, 2025] ___ So. 3d ___, ___ (Ala. 2025).

I am not sure that this characterization of the relative-hardship test as an affirmative defense accords with proper equity practice. I have been unable to find any Alabama cases decided before 2023 that describe the test as an affirmative defense. See Cole, 383 So. 3d at 654. I also have struggled to find any cases outside Alabama describing the relative-hardship test as an affirmative defense.

Whether to characterize the relative-hardship test as an element of the plaintiff's case or as an affirmative defense matters in the abstract because it is important that our law remain consistent over time. But this distinction could also matter tremendously -- in real-world, practical terms -- to a particular litigant in any given case because it will dictate who bears the burden of pleading and persuasion. In some cases, no doubt, this distinction could prove case-dispositive.

Here, the parties do not challenge the characterization of the relative-hardship test as an affirmative defense. Nor am I convinced that the outcome of this case would turn on such a characterization. For these reasons, I agree with the main opinion's conclusion that the Dendy defendants have not shown any abuse of discretion by the trial court. In an appropriate future case, however, I would be open to arguments that the relative-hardship test is not truly an affirmative defense as well as any other arguments to maintain the coherence and consistency of our equity jurisprudence across the range of substantive areas to which it applies.